BELA C. WEBSTER and GEORGE L. HUNTINGTON, plaintiffs in error, *vs.* AUGUSTUS C. FRENCH, HORACE F. ASH, ISAAC R. DILLER, PHILIP C. JOHNSON, HENRY ROOT, HIRAM RODGERS and SAMUEL HOLMES, defendants in error.

## *Error to Sangamon.*

Where sales are made upon secret bids, (candlestick biddings) or sealed proposals, as well as in sales by open bids, any thing which prevents fair competition, or tends to give one party an unfair advantage over another, will be discountenanced.

The law requires good faith and fair dealing, as well in cases of sale by sealed proposals, as by open bids. In both cases, effects and consequences are to be considered, in determining what fair dealing and the true intent of the transactions require.

As a general rule in chancery, all parties interested in the object of the suit must be made parties, before the Court will proceed to a final determination. This rule is not an arbitrary and inflexible one, but is adopted as a matter of convenience, for promoting the ends of justice; and whenever its application would defeat those ends, the rule itself must generally give way.

A Court of Chancery is not bound by any fixed rule, in relation to the tender of money. The money may at any time be ordered into Court, when the rights of a party require it. It is time enough for a party to bring purchase money into Court, when he is called upon to do so.

The ruling of this Court on the subject of tender of money, in the cases of Doyle *vs.* Teas, in 4th Scammon; DeWolf *vs.* Long, in 2d Gilman, and in Wright *vs.* McNeely, in this volume, reviewed and reconsidered.

This was a bill filed in the Sangamon Circuit Court, to enforce a conveyance of the Quincy House to the complainants.

The state of Illinois was the owner of the Quincy House property, in Quincy, Adams county. An act authorizing the sale of this property, was passed February 12, 1849. See laws of 1848–9, p. 107. The Governor was directed to sell, for state indebtedness, to the *highest* and *best bidder*, after advertising, &c.; payment for the purchase to be made in three instalments; the first on the day of sale, the second in one year, and the third in two years thereafter.

The Governor was required to receive *sealed bids* from all persons, until first July, 1849, and at that time to open and compare the bids in the presence of the Secretary of State and Treasurer; who should then declare the highest responsible bidder to be the purchaser. The purchaser, on payment of the first instalment, to receive a certificate of purchase, which should entitle him to a deed, on the payment of the other two instalments. Upon the payment of the whole amount, the Governor was authorized, in his official capacity, to convey, by deed, all the right, title and interest which the state had in the property.

The Governor advertised according to law. The first day of July being Sunday, the opening of bids was deferred until the

succeeding day. On opening and comparing the bids, it was found that Jacob Bunn had bid $15,250 ; E. A. Thompson $17,000 ; John W. McFadden, John R. Webster and W. W. B. Powers $17,000 ; C. A. Warren $17,250 ; B. C. Webster and Geo. L. Huntington $21,100. There was also found among the papers opened, a proposition from Henry Root & Co., (composed of Root, Rodgers and Holmes,) as follows :

" We, the undersigned, propose to pay the state of Illinois five hundred dollars more than any bid made for the Quincy House property, up to 10 o'clock, A. M., 2d July, 1849.

" HENRY ROOT & Co."

And also the following from Ash & Diller, (composed of Horace F. Ash and Isaac R. Diller :)

" We, the undersigned, propose to give for the said Quincy House and property, the sum of six hundred and one dollars over and above the highest bid of the highest responsible bidder for said house and property, made according to the advertisement of the Governor.

" ASH & DILLER."

The bid of Webster and Huntington being the highest specific amount, the Governor added thereto the five hundred dollars excess proposed to be given by Root & Co., making $ 21,600, and to this aggregate sum added six hundred and one dollars, the excess proposed to be given by Ash & Diller, making a total of $22,201. And, at this sum, awarded the property to Ash & Diller.

Ash & Diller did not, as required by law, pay the first instalment on the day of sale, and give the security, nor offer to do so, for the payment of the other, but instead thereof, gave their bond to do so at a future day. In about fifteen days, they tendered the first payment, and the necessary obligations for the payment of the other two, which the Governor received for safe keeping, but declined to give a certificate of purchase, until he should become satisfied as to their right to receive the property.

Webster and Huntington, on the day of sale, offered to pay the first instalment, and give proper and acceptable security for the others, as directed by law ; but the Governor refused to receive the same, stating that he had determined to accept the proposal

of Ash & Diller. And for greater caution, and to preserve as far as possible their equitable rights, did, on the succeeding day, (and before Ash & Diller had made either payment or tender,) tender to the Governor the first instalment and security (admitted by him to be sufficient) for the other two, which he again, and for the reasons before given, refused to accept. Afterwards, the Governor, on payment of the amount at which he had awarded the property to Ash & Diller, to wit, $22,201, conveyed by deed to them, and they to Philip C. Johnson; their proposal having been filed by his consent and procurement, and he being privy to all the proceedings and equities involved in the premises, and a purchaser with full notice.

The cause coming on to be heard at the August term of the Sangamon Circuit Court, 1849, the default of Root, Rodgers and Holmes was entered, and judgment *pro confesso* taken as to them. The Governor, by his counsel, and Ash & Diller and Johnson, by their counsel, severally filed demurrers to the complainants' bill. It was stipulated by the parties, for the purpose of bringing this case properly before this Court, that the Circuit Court, Davis, Judge, presiding, should *pro forma* sustain the demurrers, and dismiss the bill. To reverse this decision, and to set aside the conveyances from the Governor to Ash & Diller, and from them to Johnson, and to compel a conveyance to the complainants for the sum proposed to be given in their bid, is the object of this writ of error.

S. T. LOGAN, for plaintiff in error.

LINCOLN & HERNDON, on the same side, presented the following points and authorities:

This bidding of Ash & Diller, of six hundred dollars more than the highest bid, is not a specific bid. It is a gambling business— a stock jobbing transaction—an evasion of the law, and a total subversion of the manifest intention of the Legislature. Laws of 1849, page 107; 2 Kent, 536, 540; 5 Gilman, 513. The bidding of plaintiffs in error is a contract, and a bill for specific performance will lie. Mandamus is not the proper remedy, but only a bill for specific performance. Chitty on Contracts, 238, 239; 2 Kent, 537, 538; Story on Contracts, secs. 322, 323, 341, 342; Story's Eq. Jur., secs. 713, 714, 715, 716; Babing-

ton on Auctions, 30, 159, 162. The government is the agent of both parties. Laws of 1849, page 107; 2 Kent, 539; Story on Contracts, sec. 319. This contract will be enforced and decreed, although the state cannot and is not a party in the bill, and the state has an interest in the result of the suit. 5 Condensed U. S., 766; 9 Wheaton, 738; 1 Douglass' Mich. R., 527; 1 ibid, 225. This *tender* was in due time, and was properly kept by Webster and Huntington. 24 Pickering, 168.

M. Brayman, for plaintiffs in error, submitted the following points and authorities :

1. The policy of *open* sales at auction, is to produce competition, by disclosing to each bidder the sum bid by his adversary, and giving him an opportunity to advance upon that sum. Each bidder has before him a certain sum against which to bid, so that in each case, to make a bid is to name a sum. Even if one offers to give so much over the highest bid, his offer is a good bid, because it *follows* a bid of a definite sum, already known, and is susceptible of·instant computation, or rather requires no computation. 2. The policy of sales, upon sealed or secret bids, is to stimulate purchasers to bid high, by concealing from each a knowledge of the bid of all others, and compelling them to inquire and bid according to the real value of the property, without the chance of bidding again, after the first failure. All collusion and fraud being impossible, by reason of the bids being secret, each is compelled to offer, at first, the full amount he is willing to give. The highest bid takes the property, and if there is but one bid, it is the same. 3. At the moment appointed for opening bids, all stand upon the same footing. No one has precedence of another. In contemplation of law, they are opened and their contents announced at the same time. And the right of the highest bidder to have the property awarded to him, accrues instantly; for the transaction is in the nature of a bargain and sale, where a writtten proposal has been made by the vendor, and accepted in writing, according to its terms, by the vendee. 4. Furthermore, no proposal, which does not respond to the advertised terms, by naming a distinct and certain sum, can be deemed a bid; for it is, of itself, not susceptible of definition or computation. To be recognized as a bid, a proposal must contain a distinct proposition, which can be acted upon,

33

taken alone, and without reference to any thing out of itself. For example, a proposal is filed to give one dollar more than any other bid, and there is no other bid; or suppose all the proposals, no matter how many, are of the same character. The result would be no sale. 5. It follows, then, that the bid of Webster and Huntington, was, at the moment of opening, the highest and best, and that their right to have the property awarded to them, then became perfect. It also follows that the proposal of Ash & Diller was not a valid, perfect bid, entitled to be noticed. It could not afterwards be perfected by comparison with good bids, so as to make it available; for the time for receiving bids had gone by. It must stand as it stood at first. Gov. French had no more right to perfect it and give it retrospective effect, so as to cut off the right of Webster and Huntington, than he had to permit a written alteration of a bid for the same purpose. 6. The character of the bids was, at the moment of being opened, fixed and determined by their own terms; and it was the duty of the Governor to declare the fact. Like an auctioneer, he was, for the purposes of the sale, the agent of both parties. It will be contended that, in receiving and opening bids and announcing the result, the Governor performed an executive duty. It is not so. Signing bills passed by the General Assembly, granting pardons, and various other acts of a like character, devolving on the executive office by the constitution, imply the exercise of a *discretion*, which may not be questioned in a proceeding like this. But putting an advertisement in a newspaper, taking letters out of the post office, opening them and reading aloud their contents, in the hearing of parties interested therein, can scarcely be said to be executive functions, around which the constitution and the common law have thrown such solemn safeguards. A sheriff, a master in chancery, a special commissioner, or Richard Roe, by name, could have performed the duty as well under the law; and the fact that the person selected to perform it was Governor of the state, did not take the case out of the common rule, or invest it with additional sacredness. The making of the deed, however, was required to be done by the Governor " in his official character"—that being a duty imposed by section 25 of article 4 of the constitution, and an executive act. As to executive discretion, see Marbury *vs*. Madison, 1 Cond., 274–5–6–7. As to judicial dis-

cretion, see 1 Cond., 19, and notes. 7. Objection is made to this form of proceeding, because it affects, though indirectly, the interests of a sovereign state, and shelter sought behind the constitutional exemption of states from suit. But the case of Osborne *vs.* The Bank of the United States, 5 Condensed Rep., 760, so clearly developes the true doctrine on this point, as to remove all doubt, and to prove that an aggrieved party cannot be barred of his remedy, because a state may be affected, even though it be in a more direct manner than in the case at bar. 8. The law requires that the purchaser shall, on the day of sale, pay one-third of the purchase money, and give security for the balance. Ash & Diller did neither of these things. They were not, therefore, in contemplation of law, "responsible bidders." Their proposals should, therefore, have been rejected, even though their bid had been a valid one.

STUART & EDWARDS, with whom was W. I. FERGUSON, presented the following points and authorities:

This is a bill for a specific performance of a contract. In order to maintain the bill, two things must concur: First, there must be a contract, and, second, a person contracting, from whom, by its process, this Court can coerce the performance of the contract sought to be enforced. I deem this proposition self evident. If there is no contract according to the legal meaning of the term, there is nothing for this Court to enforce, at least upon a bill of this nature. If the person who alone could not, by any process within the power of the Court, be compelled to perform it, then this Court will refuse to interfere. It is a settled principle in equity not to interfere where no decree for the specific performance of the whole agreement can be made.

This bill is without a parallel, except partially in one case, in the whole history of jurisprudence. In this particular case, the aid of the Court is sought to review and control the acts of the executive, parts of which are admitted to be official. It is not unreasonable to require that the gentlemen should adduce some authority in support of their view of the case; and if that authority cannot be found in some adjudicated case, it, at least, should be shown that some clear right of the complainants has been violated, and that some equally clear principle of equity requires that this Court should assist them in the maintenance of that right.

The Legislature has seen proper to confer certain authority upon the executive; not upon the individual, but upon the individual in his official capacity. In so doing, they, as representatives of the people, have reposed confidence in the judgment, the discretion and integrity of that officer, and when this Court attempts to reverse the acts of that officer in the exercise of the power conferred by the Legislature, the power of the Court should be incontrovertible, and the right of the party complainant indubitable. The state is a necessary party, and as no suit could be maintained against it, the Court has no jurisdiction. As to parties, Story's Eq. Pl., sec. 81; Walker's Mich. Rep., 9. The case of Osborne *vs.* Bank of U. S., 5 Con. U. S., 766, is no authority against this position. The property involved in this controversy is the property of the state. Her interest is direct and immediate; not a mere passive subject of the jurisdiction, but is, if this suit is maintained, required through her agent to be an active party in carrying out the decree. When the suit seeks to divest the title of the government, the Court of Chancery cannot entertain jurisdiction. 1 Daniel's Ch. Prac., 104; 2 Sch. & Lef., 616–17. By the act of the Legislature, the Governor was to decide on the character of bids and bidders: he was authorized to make the award, and his decision is final. Under the United States land laws, the decisions of registers and receivers are final; and so of other officers, commissioners, &c. McConnel *vs.* Wilcox, 1 Scammon; 3 Merrivale, 472; Bennet *vs.* Farrar, 2 Gilman, 601. The decision as to the character of bids, and responsibility of bidders, is dependent upon the discretion of the Governor. From that decision no appeal has been provided. It is, therefore, conclusive, unless impeached for fraud. Le Roy *vs.* Corporation of New York, 4 Johns. Ch. Rep., 352; Mooer *vs.* Smedley, 6 J. C. R., 28; Walker *vs.* Devereaux, 4 Paige, 249; Rex *ex rel.* Scales *vs.* Mayor and Aldermen of London, 3 Barnwell & Ad.; Patterson *vs.* Mayor, &c., N. Y., 1 Paige, 114; Phillips and others *vs.* Wickham, ibid, 590; Champlin *vs.* Mayor, &c., 3 ibid, 593; 13 Peters, 511; Martin *vs.* Mott, 6 U. S. Cond. Rep., 418. The acts to be done in this case were executive, and cannot be restrained or directed by this Court. The Court could not enforce a decree in this case, should the same be rendered. Madison *vs.* Marbury, 1 U. S. Cond. Rep., 278; 1 Arkansas, 1; Deca-

tur *vs.* James R. Paulding. 14 Peters, 497. When defect for want of parties is vital to the character of the bill, or fatal to the jurisdiction of the Court, advantage thereof may be taken at any stage of the case. Story's Eq. Plead., 263.

There was never any contract, such as this Court could enforce, entered into between the Governor and complainants.

It is not deemed necessary to cite authorities to show that sales of this kind are within the statute of frauds. The statute authorizing the sale of the property points out the manner in which the contract is to be consummated, namely, by the declaration of the Governor, and the certificate of purchase, which is to be concurrent with the payment of the first instalment. This declaration and certificate, or at least the declaration, is in the place of signing by the auctioneer, which is required in all cases of sales at auction.

A bill for specific performance will not lie against a person on a contract for the breach of which he is not personally liable in an action *ex contractu.* Hickman *vs.* Grimes, 1 A. K. Marshall, 87; Smith *vs.* Carney, 1 Litt., 295. And this is undoubtedly the law where the person contracting is acting for others. Story's Eq., vol. 2, p. 45, sec. 741; 3 Merrivale's Rep., 472. The Governor, acting as the agent of the state, and contracting as such, could not be sued on this contract. 1 Term Rep., 172; ibid, 674; 1 Cranch, 347. The award of the executive was right, and the bid good and valid. 1 Sugden on Vendors, 17; 3 Merrivale's Rep., 472, and following.

But lastly, this bill is defective, and should be dismissed, because it does not aver a sufficient tender and continued willingness and readiness to perform on the part of the complainants, by bringing the money and notes into Court. DeWolf *vs.* Long, 2 Gilman, 679; Doyle. *vs.* Teas, 4 Scammon, 202; Wright *vs.* McNeely, decided at this term of the Court.

BROWNING & BUSHNELL, on same side, made the following points :

The power was a judicial and discretionary one, and the decision of the Governor was conclusive. Martin *vs.* Mott, 6 Cond., 418, 419; Lane *vs.* Dorman, 3 Scam., 241, 242; United States *vs.* Arredondo *et al.*, 6 Pet., 729; Vanderheyden *vs.* Young, 11 Johns., 158; The People *vs.* Collins, 19 Wend., 60,

64; Gaines *vs.* Buford, 1 Dana, 481, 484, 506; Merrill *vs.* Sherburne *et al.*, 1 N. H., 203, 205; Gordon *vs.* Farrar, 2 Doug., 415; Fletcher *vs.* Peck, 2 Cond., 319, 320; Roe *vs.* Harris, 2 Wash. Va. Rep., 126; Henderson *vs.* Brown, 1 Caine's Rep., 101; Wilcox *vs.* Jackson, 13 Pet., 511; McConnel *vs.* Wilcox, 1 Scam., 350, 351; Bennet *vs.* Farrar, 2 Gil., 602; Brown *vs.* Jackson, 5 Cond., 274; Walker *vs.* Devereaux, 4 Paige's Ch. Rep., 249, 250; Rex *vs.* Mayor of London, 23 Eng. Com. Law Rep., 67, 68; Stuyvesant *vs.* Mayor, &c., of New York, 7 Cow., 606 to 608. The Court will direct and control ministerial, but not judicial officers. It will set them in motion —require them to act, but not control their judgment. The Governor was a judge, and if, after the bids were in, he had refused to examine and decide upon them, it may be that the Court would have entertained a mandamus to compel him to decide, but it would not have directed what the decision should be. Judges of Oneida C. P. *vs.* People, 18 Wend., 93; The People *vs.* The Superior Court of N. Y., 5 Wend., 125; The People *vs.* Judges Dutchess C. P., 20 Wend., 659; Wilson *vs.* Supervisors of Albany, 12 Johns., 415; Hull *vs.* Supervisors of Oneida, 19 Johns., 260; Judges of Oneida C. P. *vs.* The People, 18 Wend., 93; Hull *vs.* Supervisors of Oneida, 19 Johns., 261. A bill for specific performance will not lie in this case, because it seeks to divest the state of title to land. The state cannot be sued, and, of course, the Court has no jurisdiction to decree against her. 1 Daniel's Ch. Pr., 175; Hovenden *vs.* Ld. Annesly, 2 Schoals & Lefroy, 617; Story's Eq. Pl., sec. 69; Osborne *vs.* Bank U. S., 5 Cond., 760, 761; Reeve *vs.* Attorney General, 2 Atk. R., 223. A bill for specific performance will not lie against a person to enforce a contract on which he would not be personally responsible for damages, as when he is acting for others. Hickman *vs.* Grimes, 1 A. K. Marsh., 87; Smith *vs.* Carney, 1 Litt., 297; 2 Story's Eq., 45, sec. 741. The Governor was the agent of the state, the contract was the contract of the state, not his individual contract, and for any damages, the Governor could not have been sued at law. Macbeth *vs.* Haldimand, 1 T. R., 172, marg. synopsis; Unwin *vs.* Wolseley, 1 T. R., 674, marg. synopsis; Williams *vs.* Steward, 3 Merrivale, 506; Hodgson *vs.* Dexter, 1 Cond., 331, 332. This is a bill to compel a contract to be made. The bid does not make the contract, but

the bid and its acceptance united. The complainants' bid never has been accepted. No contract, therefore, exists, and, of course, there is no contract to be specifically enforced. Either party might have withdrawn the offer at any time before its acceptance. Payne *vs.* Cave, 3 T. R., 149; Downing *vs.* Brown, Hard., 181; 1 Sug. Vend., 48, top paging; Chit. on Cont., 319; Babington on Auctions, 30, 31, 42, marg. Mutual consent is required before a contract is completed: until then the matter rests in negotiation. Mactier *vs.* Frith, 6 Wend., 111; Eliason *vs.* Henshaw, 4 Cond., 433; Bruce *vs.* Pearson, 3 Johns., 534; Tucker *vs.* Woods, 12 Johns., 190.

The bid of Ash & Diller was the highest and best bid. The bid itself was a legal bid, and such as the Governor was authorized and required by his duty to the state to accept. Bids of a similar character have frequently been made and sustained as valid. The act does not require a specific bid. 1 Sugden on Vend., 20, top paging; Babington on Auctions, 44, 45, marg.; Williams *vs.* Stewart, 3 Merrivale, 471, 504. Even if the bid of Ash & Diller was irregular, it was still a bid, and being higher than the bid of Webster and Huntington, the latter would not have made the highest and best bid, and would not have become entitled to the property. The state may, of course, waive the irregularities of a bid, and give the property to the bid which is irregular. Williams *vs.* Stewart, 3 Merrivale, 504, 506. Nor does the demurrer to the bill admit that Huntington and Webster were the highest responsible bidders. This might be the case, had the bill simply averred that fact; but the bill sets out all the facts from which that conclusion is sought to be drawn, and the demurrer only admits the facts, and devolves it upon the Court to draw the legal conclusion from them. 3 Merrivale, 503.

The bill is founded on the idea that the bid of, and sale to Ash & Diller was invalid. If they were not purchasers for themselves, the sale is void, and they cannot be held as the trustees of a title for others, which is not in them. The positions are incompatible. 3 Merrivale, 506.

Opinion by Mr. Justice CATON:

On the 12th of February, 1849, the General Assembly passed a law authorizing the Governor to sell the Quincy House, be-

longing to the state. The second section of that act required the Governor to advertise the property, stating the terms and conditions of the sale. The third section provided that the property should be sold for state indebtedness, one-third to be paid down, and the balance in one and two years; and that, for the two last instalments, notes should be given, with sureties to be approved by the Governor. The fourth section says : " The Governor shall receive written sealed bids for said property, from all persons, until the first day of July, A. D. 1849, at which time all the bids received, shall be opened and compared by the Governor, in presence of the Secretary of State and Treasurer; who shall then declare the highest responsible bidder to be the purchaser of said property, who shall, upon the payment of the first instalment, receive a certificate of purchase, which shall entitle him or his assigns to a deed for said property upon the payment of the other two instalments." The fifth section authorizes the Governor "in his official capacity," to convey by deed, &c.

In obedience to this act, the Governor advertised the property for sale, and on the 30th of June, the complainants filed their sealed proposal, offering $21,100 for the property, which was the highest specific bid made, although several for less amounts were filed. On the same day the defendants, Ash & Diller, filed a sealed proposal to give for the property "the sum of six hundred and one dollars over and above the highest bid of the highest responsible bidder." Henry Root & Co., on the next day, filed a similar proposal, offering "five hundred dollars more than any bid made." The first day of July being Sunday, the bids were not opened till the next day, when the complainants attended, and offered to pay the amount of the first instalment upon their bid, and to execute their note, with sureties to be approved by the Governor, according to the terms of the act, but the Governor informed them that he would not receive said payment and note, because he had determined to accept the proposal of Ash & Diller. On the next day the complainants made a formal tender of the first instalment and note, which was in like manner refused. The proposal of Ash & Diller, which was accepted by the Governor, was computed at the sum of $22,201. The complainants in their bill set forth these facts, and also aver, that some days after, Ash & Diller tendered the said first

instalment and note, with sufficient sureties, to the Governor, who took charge of the same for safe keeping, but refused to give a final decision as to the legal effect of this tender. The bill also charged that the defendant, Johnson was in some way interested in the bid of Ash & Diller.

The bill further shows that it is, and for a long time has been, an established custom of the post office department, and other departments of the United States government, and others, individuals and corporations, who habitually have made, and do make contracts upon written sealed bids, to reject such proposals as those of Ash & Diller, and of Root & Co., as not fair, *bona fide* and valid bids.

As to Root & Co., the bill was taken for confessed. The other defendants filed a demurrer, which was *pro forma* sustained, and the bill dismissed. Previous to the order sustaining the demurrer, there is in the record an agreement of the parties, showing that since the bill was filed, the Governor has conveyed the premises to Ash & Diller, and that they have conveyed to Johnson. Although the agreement does not stipulate that these facts shall be considered as if presented by a supplemental bill, yet the case has been here argued by the counsel on both sides as if such were the state of the record, and so, for the purposes of the present decision, has it been considered by this Court.

From the barrenness of the books upon questions arising upon this sort of secret or sealed bidding, we may reasonably infer that till recently, at least, this has not been a very common mode of making sales or entering into contracts. At the present time, however, this mode of selling property is very common, and contracts for the construction of public works are almost universally made in this way, as well as a vast variety of other contracts, both by the general government and state authorities. The practical operation of this mode of doing business, has so recommended it to the favor of the public, that it has already become thoroughly incorporated into our business habits, and hence the question before us becomes one of peculiar importance.

Where sales are made upon secret bids, or sealed proposals, it is in fact but another mode of selling by auction, and in this, as well as in sales by open bids, anything which prevents fair competition, or tends to give one party an unfair advantage over

34

another, must be discountenanced by the Courts. The same rules of morality, fairness, and justice must govern in the one case as in the other.

The only case referred to or found, which is supposed to have any similarity to this, is Williams *vs.* Stewart, 3 Merrivale, 471 ; and what is said by Lord Eldon there, on this question, it is admitted, is but *dictum;* for he professedly went out of his way to express an opinion on this point, while he decided that he had no jurisdiction of the case made. There, commissioners were authorized to sell certain land tax to the highest bidder, and they were required by an act of parliament to post a notice of the first bid received, for fourteen days on the church door, and in case no other offer was made in that time, exceeding the first offer by at least one per cent., they were *authorized* to close with the first offer. But in case an offer was made exceeding the first by at least one per cent., they were required to sell to the person offering the highest price. One of the commissioners made an offer which was posted on the church door. Then the complainant, Williams, offered sixty per cent. more than that offer, and Isted offered " one per cent. above the offer of any other person," and the Lord Chancellor expresses the opinion that this bid was binding on Isted. The act in that case did not say whether the bids should be secret or public, nor does the bill show but that all the bids were in fact public. This statement is sufficient to show that neither the law nor the bidding under it were like those in the case before us. Here the law expressly required all the bids to be under seal, which could not be opened till the bidding was closed. The bidding in this case, therefore, was in the strictest sense secret, and must be governed by rules reasonably adapted to such a proceeding.

In the case above referred to the Chancellor says that sales where one bidder does not know what another has offered, are denominated candlestick biddings in the north of England, where it was never doubted that a bid of one per cent. more than any other offer, was binding on the bidder. If we are to understand from this that it was also binding on the seller, the most that can be said for it is, that in the north of England custom had sanctioned this kind of offer. In this country, where this kind of secret bidding has become so common, we learn from this bill

that custom has adopted a different rule, and all such bids are rejected as void.

There are a great variety of ways in which auction sales are conducted, where the bidding is public; yet all are governed by the same general principles. In case of sales where the bidders make written sealed proposals, within a given time, at the expiration of which, and not before, the bids are opened and the highest bidder is declared to be the purchaser, it is but another, although an entirely distinct kind of sale by auction. Each of these modes of auction sales possesses its advantages and disadvantages, both to the buyer and to the seller. In case of open public sales, the bidders have the advantage of each other's judgments, and can see at once how high it is necessary to bid in order to secure the property, while the seller has the advantage of open competition among the bidders. In such a sale each bidder has a right to know what bids are made by others, and to entertain a secret bid would be a fraud upon all the other bidders. Even open bids, apparently made in good faith, but which are not made with a design to purchase the property, but which are procured by the seller, in order to induce others to bid higher, are fraudulent, and for which the purchaser may refuse to complete the contract. Brixwell *vs.* Christie, Cowper, 395. So also a secret combination among the bidders, for the purpose of preventing fair competition, is a fraud upon the seller, for which he may avoid the sale.

The peculiar advantages, to both seller and bidders, where the sale is by secret bids or sealed proposals, are also obvious, and anything which deprives either party of these proper advantages, ought in like manner to be treated as fraudulent. In this kind of sale it is to the advantage of the seller, that the bidders should not know who they are bidding against, or against what bids they are contending, except as they may conjecture; and it is the manifest right of each bidder that others should be kept in ignorance of the amount of his bid. The object is to make each one bid upon his own judgment, and independent of other bids, and without regard to them, except as he may conjecture what they may be. Should the seller upon a sale like this, before the time for bidding had expired, open a bid and communicate it to another, who should thereupon make a higher offer, the sense of justice of every man would revolt at such a proceed-

ing. In that case the bidders would not be upon equal terms ; and were such a practice tolerated, all confidence in this kind of sales would be at an end.

It is said that the bid here received is within the terms of the law, and conformable to the terms of the sale, it being literally and in fact a higher bid than that of the complainants. This may be admitted without making the offer a legal bid. It is not enough at all times that a bid should be within the express terms of the sale. Neither party can shield himself behind a literal compliance with these terms, when he attempts to commit a fraud, or do any other act which is unfair or unjust towards other parties who are interested in the sale. When Lord Mansfield first held, in the case of Brixwell *vs.* Christie, that by-bidding was a fraud upon real bidders, it was not denied that such a practice was no violation of the express terms of the sale, yet he did not hesitate to hold it to be a fraud, simply because it was unfair. He justly remarks, " the basis of all dealing ought to be good faith." There is never to be found in the terms of an auction sale, a clause prohibiting the bidders from combining together to prevent competition, still it is none the less unlawful for them to do so. The law implies every thing which good faith and fair dealing require, and none the less so in the case of sales by sealed proposals than by open bids. In both cases effects and consequences are to be considered, in determining what fair dealing and the true intent of the transaction require. This principle has long been applied to sales by open bids, and we cannot doubt that it ought to be applied where the bids are by sealed proposals.

Suppose in the case of a sale by open bidding, a written bid should be received, of which the other bidders were ignorant, it would hardly be denied that that would be a fraud upon the other bidders, and yet the case before us is in principle the counterpart of such a bid. In the former case, it is the right of each bidder to know what the others offer ; in the latter it is the right of each to have his bid kept concealed. For the seller to admit the bid of Ash & Diller, has the same effect upon the bid of the complainants that it would have had for him to have allowed them to make a specific bid, after that of the complainants had been opened and made known. If this bidding is allowed, then one man, by offering a nominal sum over all others, may appro-

priate, to his own advantage, the judgments of others, who may have gone to great expense to form a correct opinion, when the very mode of selling was designed to give to each bidder the benefit of his own superior judgment.

To allow such a bid, is to render absolutely unavailing all specific bids, as well those made subsequently as those which were filed before. It precludes all possibility of a specific bidder getting the property, and all prudent and responsible men are driven from such sales, or else they must resort to some trick to avail themselves of such a practice. All fair competition is destroyed, for some such bid must always take the property. If these bids are tolerated, a responsible man will either not bid at all, or else he will get some irresponsible person to bid for him, behind whom he will stand till the result determines whether the bid is an advantageous one or not. If it is, he will then step forward with the funds to complete the purchase, but if it is not, he will remain in the dark, and allow the bid to be disregarded as irresponsible; where, as in this case, that right is reserved, or else will compel the seller to look to an irresponsible man for his remedy. This kind of bids will necessarily introduce and encourage this sort of tricks and practices, and real, *bona fide* bidders will not be found. Specific bids, with the expectation of getting the property, will cease to be made, and then, for want of a basis upon which these fancy bids may rest, they must fall to the ground, and there will be an end of all this kind of sales.

But in this case there were two offers of the same character, and by what rule was the preference given to Ash & Diller? They offer $601 over the highest bid of a responsible bidder, and on the next day, Root & Co. offer $500 more than any bid made. Was Ash & Diller's a *bid made?* Then this last was $500 more. Now, the rule adopted was, to add to the highest specific offer, the bid of $500, which was last made, and to this sum was added the previous offer of Ash & Diller, making in all the sum of $22,201, which was decided to be the amount of Ash & Diller's bid, and for which they were declared to be the purchasers. If the principle was to be adopted of tacking to the highest specific bid the excess offered in one of the uncertain bids, and considering the latter a specific bid, to that amount, and then add to that the excess offered in the other uncertain bid, in order to determine its

amount, we are unable to discover any satisfactory reason for giving the preference to Ash & Diller. Their bid was not only prior in date, and uncertain in amount, but it was also conditional, for it was so much above the highest bid of the highest *responsible* bidder, while the bid of Root & Co. was last in point of time, and unconditional, being so much more than any bid made. If Ash & Diller were now seeking to avoid their bid instead of insisting upon it, it would be hard to show that theirs was higher than that of Root & Co., for they being the next bidders after Webster and Huntington, might, with apparent propriety, insist upon having their bid first added to the highest specific offer, in order to determine its amount, rather than having a subsequent bid of the same character thrust in between them for the purpose of enhancing theirs. Had the order in which these offers were made been regarded, and that of Ash & Diller first added to that of the complainants, and to that sum had been added the last offer made by Root & Co., for the purpose of ascertaining its amount, they would have been declared bidders for the same sum for which the property was awarded to Ash & Diller. But it seems to us impossible to lay down any satisfactory rule to ascertain which of these uncertain offers should be first added to the specific bid, for the purpose of enhancing the other, and hence the impossibility of determining which of these was the highest. Each having an equal right to claim the benefit of the rule, each may with equal propriety insist that theirs is the highest, for it would be so when the rule is applied to it. By applying the rule to each alternately, they are made of equal amount. In such an event, it was substantially admitted in the case of Williams *vs.* Stewart, by the counsel who supported the uncertain bid, that the two bids would destroy each other; for they say, "it may be objected if another person had made a similar offer, the two offers would have amounted to nothing, and the commissioners could have accepted of neither. But it is enough to say, that in the present instance no such case has arisen."

If this sort of bidding is sustained, it may prove no less detrimental to the seller than to the other bidders. The reason urged in support of Ash & Diller's bid is, that as the property was worth more to them than it could be to any one else, it was but right that they should be allowed to secure it by offering to pay

so much more than any one else would. But this peculiar value of the property to them, is a circumstance of which the seller is entitled to the full benefit; and the very fact of their adopting this mode of bidding, shows that they supposed that they could obtain it cheaper in this way than they could by offering a specific sum; which they would be entirely certain would exceed any other offer. When men are so anxious to get property that they are willing to put in a desperate bid rather than run the risk of losing it—a bid which might prove absolutely ruinous, if strictly enforced, we may well suppose, if compelled to offer a specific sum, that they would bid at least up to the full value of the property to them.

Laying out of view the immoral tendency, so forcibly urged upon the argument, of this sort of reckless, desperate, gambling bidding, would have upon the community, we have no hesitation in saying that it is unfair towards other parties, and that such offers ought to be treated as no bids at all.

It is true, that by accepting the bid of Ash & Diller, with the construction given it, something more than a thousand dollars would be obtained for the property over the bid of the complainants; but that sinks into insignificance when compared with a great principle, the determination of which must so essentially effect business transactions throughout the state. We are fully satisfied, that sales could not be safely made, or contracts entered into by sealed proposals, if bids like this were allowed. Each bid should be a complete and independent offer of itself, depending upon no other bid for its explanation or support, and which, if there were no other bid, would effect a sale of the property.

Several other objections are taken to this bill, which will be now considered. It is said that the state is interested, and that it is a fatal objection that she is not a party. That the interest of the state may be incidentally, if not directly, affected by the decree in this case, is undoubtedly true. As a general rule all parties interested in the *object* of the suit must be made parties, before the Court will proceed to its final determination. This rule, however, is not an arbitrary or inflexible one, but is adopted as a matter of convenience, and for the purpose of promoting the ends of justice, and whenever its application would defeat those ends, the rule must generally give way. 1 Story's

Eq. Pl., sec. 77. Many instances are to be found where the rule has been dispensed with, on account of the great inconvenience and delay which it would occasion, although there was a possibility of its being complied with. How much more readily, then, should we admit an exception where there is an absolute impossibility of its being complied with. Here the state cannot be made a party. She shields herself behind her sovereignty, and refuses to allow herself to be brought into Court. But what is the object of this suit? It is to determine which of these bidders shall have the property. In this, they are the parties directly interested. If the state were a party, she could not claim the right to hold it. She might have an incidental interest as to which shall succeed, as the amount which she may get may be thereby effected, and it may be that an individual occupying her position would be considered a necessary party. But here, as before remarked, it is impossible to make her a party, and surely that cannot be allowed to defeat a just claim of right, which one citizen may have against another. But this is not a case of first impression. This identical question was settled by the Supreme Court of the United States, in the case of Osborne *vs.* U. S. Bank, 9 Wheat., 738; 5 Con. R., 740. There the state of Ohio had passed a law taxing the bank. The state Auditor had collected the tax which had been paid over to the Treasurer, who had, upon the books of his department, passed it to the credit of the state, although the fund was actually kept separate. A bill was filed by the bank against the Auditor and Treasurer, for a discovery and injunction, and to have the money refunded. The state law was declared to be unconstitutional, and a decree passed ordering the money to be refunded by the Treasurer, without the state being a party, notwithstanding the direct and palpable interest which she had in the object of the suit. Could any doubt have existed, this case abundantly answers the objection, and, as we think, upon correct principles.

But it is said that the Governor was vested with the sole authority to determine who is the highest responsible bidder, and that his decision in the exercise of this discretionary power, is conclusive. At most, but a part of this proposition is true. Discretion is not the exercise of the will, but of the judgment, when applied to a question capable of being determined in different ways. Ordinarily, with the exercise of such a discretion, other

tribunals will not interfere. But in no sense of the word can a man have a discretion to determine which of two given sums or numbers is the greater. That must be determined by comparison alone, and not by the judgment. The Governor was not authorized to receive any but legal bids, and we have already seen that the proposition of Ash & Diller was not such a bid. In no event, then, could it be brought in competition with the bid of the complainants. It was impossible that the exercise of a discretion should be involved in determining which was the highest bid, and hence no such discretion could be conferred. It may be admitted that the Governor was vested with a discretion to determine who were responsible bidders, but that question he determined in favor of the complainants, for he made their bid the first basis upon which to determine the amount of the offer of Ash & Diller, and by the very terms of their offer, only responsible bids could be used for such a purpose. In rejecting the complainants' bid, he did not pretend to place it upon the ground that they were irresponsible bidders, or that they had not in all respects complied with the terms of the sale, but he placed it solely upon the ground that theirs was not the highest bid. In this there was the exercise of no discretion involved.

Again, it is said that the duties imposed upon the Governor by this act, were of an executive character, and not merely those of an agent, and that the Courts will never interfere with a co-ordinate branch of the government, in the exercise of its legitimate functions. Without entering upon the discussion of the question of power or jurisdiction involved in this proposition, it is clear that all the duties imposed upon the Governor by this act, except perhaps the mere act of making the conveyance, are merely those of an agent, which might as well have been conferred upon any other officer or individual. The fifth section of the act says : "the Governor is hereby authorized, in his official capacity, to convey by deed," &c. Now the requiring him to do this one act in his official capacity, shows that the Legislature did not suppose that in doing the other act required of him, he would act in his official capacity.

But because the executive may have to do an official act, in order to invest an individual with the technical legal evidence of a right, it would be a reproach to the institutions of a country, to say that the Courts of justice would not determine between

35

the conflicting claims of individuals to that right. We are not to be asked how we will enforce or protect that right, when the action of the executive is required to do an act by which alone the right can be completely secured, for it is not a supposable case that the executive will refuse to discharge a mere ministerial duty, when the rights of the parties are once legally ascertained. The same objection might be urged where the Court is about to try a contested election, for the office of justice of the peace or sheriff, because the Governor alone can issue the commission. It can never be supposed that coercive measures will be required to induce the highest officer of the state to discharge a manifest ministerial duty, upon which the rights of individuals depend.

But in this case even the possibility of such a contingency does not exist. No further act of the executive is required to vest the legal title in the parties to whom in equity it may belong. The Governor has already deeded the property to Ash & Diller, and they have conveyed it to Johnson, where the powers of a Court of Chancery are abundantly adequate to reach it. If one who holds a legal title in trust for, or who is equitably bound to convey to another, transfers the legal title to a third person, who is aware of the equitable title, that third person becomes a trustee, and is as much bound to convey to the real owner, as if he had acquired the title with an express agreement to perform the trust. The present possession of the title, therefore, relieves the case from all embarrassment as to the means to be adopted to do complete equity between the parties.

It was further objected that there is no contract with the complainants for the Court to enforce. That till the bid of the complainant is accepted by the Governor, there is no contract, although theirs is the highest bid, and that such acceptance should be in writing, to take it out of the statute of frauds. As to the statute, that cannot be objected on a demurrer. The other question, as to when the bargain is struck in sales of this sort, although an important one, we think it is free from difficulty. The question may be readily solved by the application of familiar principles. In this sort of sales, written or printed proposals are issued, offering to sell the property to the person who will, within a given time, agree in writing to give the most for it. The person, therefore, who brings himself within the terms of the

sale, or, in other words, meets, in writing, the written proposition of the seller, thereby closes the contract of purchase. It is in principle precisely like the case where one addresses a letter to another, offering to sell property on specified terms. There, if the person addressed sends an answer in due time, acceding to the terms, the bargain is at once struck, and the correspondence constitutes the written evidence of it. This view of the subject seems to us conclusive of the question, without resorting to the fact, that in this case there is a special law, behind the public written offer of the Governor, which, of itself, confers the right to a conveyance of the property, upon the party who shall bring himself within its terms.

There is but one other question made in this case, which we think it necessary to examine. It is objected that the complainants have not actually brought their tender into Court with their bill, and deposited it with the clerk. In this Court, this is in fact a new question, as now presented, although in three different cases, in all of which the opinions were prepared by myself, it has been stated, that the tender should be kept good by bringing the money into Court; yet in none of these was the question distinctly presented, or necessary to a decision, for in none of them had a sufficient tender ever been made, and, consequently, the question did not undergo that careful consideration which would have been given it, had the case turned upon that point. The cases referred to are, Doyle *vs.* Teas, 4 Scam., 257; De Wolf *vs.* Long, 2 Gilman, 679, and Wright *vs.* McNeely, *ante*, 241. We consider ourselves, therefore, at full liberty now to examine the question, at least, without being concluded by what has formerly been said on the subject.

The question, whether a party who files a bill for a specific performance of a contract for the purchase of land, shall bring the unpaid purchase money into Court, does not seem to have attracted much attention, for in no case do I find it carefully examined upon principle. The tenor of the decisions, however, upon bills of this character, shows that there is no uniform or inflexible rule, making such a deposit indispensable in the first instance. It is true that expressions are to be met with in the opinions of other Courts, as strong perhaps as those used in the cases above referred to, but it will be seen that they are not to be understood as asserting an indispensable prerequisite. Thus,

in the case of Jarbol *vs.* McAlies' Heirs, 7 B. Monroe, 279, the Court said : "but were the evidence on this point sufficient, in order to make a tender available in a case of this kind, it is incumbent on the complainant to pay the money into Court, so that during the long progress of a chancery suit, it may, under the control and direction of the chancellor, be rendered productive. In a plea of tender at law, the party, to get the benefit of his plea, has to bring the money into Court. Much stronger reasons exist for requiring this to be done in a case to be settled by the chancellor;" and yet in that very case a specific performance was decreed, although the money had not been brought into Court, nor was even a tender strictly proved ; and the only penalty imposed upon the complainant, for this omission, was, that he had to pay interest on the amount during the pendency of the litigation, he having had possession of the premises in the mean time. But cases of even greater indulgence to the complainant, are to be met with. In Burke *vs.* Boquet, 1 Dessaus., 142, which was a bill for a specific performance, it does not appear that either a tender or a deposit in Court of the purchase money was made, and yet it was decreed, "that it be referred to the master, to state and report what is the balance due on the contract in the bill mentioned, and that on the payment thereof, with interest, and of the costs of suit, within one month from this day, the defendant execute title to the complainant in the bill mentioned." From the brevity with which this case is reported, we cannot learn its particular circumstances, but the decision itself shows that the suit might be maintained without a deposit of the purchase money. The suit of Louthler *vs.* Anderson, 1 Bro. Ch. R., 347, was of the same character, and upon a rehearing before the chancellor, "his lordship varied the decree, in the manner prayed, by ordering it to be referred to the master to appoint a short day for the payment of the money, and to compute subsequent interest till that time, and if, upon a tender of a sufficient conveyance, the principal money and interest should not then be paid, the plaintiff's bill to be dismissed, (as against defendants) with costs." Here is the same case, of time given to the complainant, even beyond the hearing, for the payment of the purchase money.

In Hunter *vs.* Daniel, 4 Hare, 3 Eng. Ch. R., 420, which was also for a specific performance, it was objected on demurrer,

that the complainant had not.complied with his part of the agreement, by paying or tendering the whole of the purchase money, and to this the Court said, "the only remaining point insisted upon was, that the making of every payment was a condition precedent to the right of the plaintiff to call for the execution of the agreement—or, in fact, to call for the benefit of it; and it was argued that the bill could not properly be filed before the plaintiff had, out of Court, fully performed his agreement. The general rule in equity certainly is not of that strict character. A party filing a bill submits to every thing that is required of him, and the practice of the Court is not to require the party to make a formal tender; whereas in this case, from the facts stated in the bill, or from the evidence, it appears the tender would have been a mere form, and that the party to whom it was made would have refused to accept the money. The defendants, according to the allegations of the bill, insist that the agreement is altogether void, and the plaintiff therefore is at liberty to contend that the tender would have been useless." The reason for a different rule at law is stated in that case.

In New Hampshire, where by express statute a redeeming mortgagor was required to make a tender and bring the money into Court, in the case of Bailey *vs.* Metcalf, 6 N. H. R., 158, the Court said: "in this case the money tendered has not been brought into Court. But if it were the only difficulty in the case of the demandants, it might perhaps be now removed, by lodging the money with the clerk."

The only case which I have found, where this precise question has been presented by the record and directly decided by the Court, is that of Washburne *vs.* Dewey, 17 Vermont, 92. There, the defendant objected, that "though the oratrix tendered the money properly before the time specified, yet the tender was not kept and brought into Court when this bill was entered." The Court said: "the excuses for not performing this contract are, if not frivolous, at least very unsatisfactory. The oratrix having tendered to the defendant the money for the payment of the note, had nothing further to do until the defendant manifested his willingness to comply with his obligation, and demanded the money. There is no pretence therefore for saying 'the tender was not kept good.'"

The result of my examination of this subject clearly shows that the Court of Chancery is not bound down by any fixed rule on this subject, by which it will allow the substantial ends of justice to be perverted or defeated by the omission of an unimportant or useless act, which nothing but the merest technicality could require. The money may, at any time, be ordered to be brought into Court, whenever the rights of the opposite party may require it; but while he is insisting that the money is not his, and that he is not bound to accept it, it would seem to be a matter of no great consequence to him whether it is in the custody of the Court or not. The Court possess a liberal and enlarged discretion on this subject, by the proper exercise of which the rights of all parties may be protected. In all the precedents which I have examined in cases like this, I do not find a single instance in which the complainant, by his bill, professes to bring the consideration money into Court, although a tender is most generally averred. Even where a bill is filed by a mortgagor to redeem, he does not profess in his bill to bring the money into Court, nor is it usual for him to do so, but he only makes a present offer to pay the money. He might, probably, by tendering the amount due, and by bringing it into Court, stop the interest, but if he does not choose to do this, I do not think a precedent can be found, for dismissing a bill for that reason. I can perceive no stronger reason for requiring the money to be brought into Court, in the first instance in this case, than in the case of a mortgage. In the case of a bill of interpleader, where the practice on this subject is much more strict than in any other case in chancery, the rule is not inflexible that the fund shall be deposited in Court, and I have been unable to find a single instance, where even such a bill has been dismissed for the sole reason that the fund was not deposited at the time the bill was filed. Indeed, it has been expressly decided that such a bill is not demurrable, because the plaintiff does not offer to bring the money into court. Menx *vs.* Bell, 6 Sim., 175; 1 Smith's Ch. Pr., 2 Am. Ed., 476; 3 Daniel's Ch. Pr., 1 Am. Ed., 1760.

Without pursuing this subject further, I am satisfied that the expressions used by me in the cases referred to, were not warranted by the law, or at least that they should not be understood as laying down an inflexible rule, prescribing an indispensable condition, which must be complied with before the complainant

is properly in Court, or even before the Court will proceed to determine the rights of the parties. It is time enough for the party to bring the purchase money into Court, when he is called upon to do so.

The decree of the Circuit Court is reversed, with costs, and the suit remanded, with leave to the complainants to amend their bill and to file a supplemental bill, as they shall be advised, and with leave to the defendants to answer.

*Decree reversed.*