# Illinois Official Reports

## Appellate Court

---

**FirstMerit Bank, N.A. v. McEnery, 2020 IL App (3d) 180287**

---

| | |
|---|---|
| Appellate Court Caption | FIRSTMERIT BANK, N.A., as Successor-in-Interest to George Washington Savings Bank, Plaintiff-Appellee, v. WILLIAM J. McENERY, Defendant (William Wendt, Intervenor-Appellee; James Torrence and William Torrence, Third-Party Citation Respondents-Appellants). |
| District & No. | Third District<br>Nos. 3-18-0287, 3-18-0584 cons. |
| Filed<br>Rehearing denied | April 14, 2020<br>May 27, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 10-L-477; the Hon. Mark Thomas Carney, Judge, presiding. |
| Judgment | No. 3-18-0287, Affirmed.<br>No. 3-18-0584, Reversed. |
| Counsel on Appeal | Cindy M. Johnson, of Johnson Legal Group, LLC, of Chicago, for appellants.<br><br>R. Timothy Novel and Benjamin E. Haskin, of Aronberg Goldgehn Davis & Garmisa, of Chicago, for appellee. |

JUSTICE O'BRIEN delivered the judgment of the court, with opinion.
Justice Wright concurred in the judgment and opinion.
Justice Holdridge concurred in part and dissented in part, with opinion.

**OPINION**

¶ 1     We consolidated two related cases on appeal. In the first appeal, the third-party respondents appealed a turnover order in an action by a judgment creditor to collect on a debt. In the second case, the unsuccessful bidder for the assets that were the subject of the turnover order appealed a postjudgment court order denying his motion to compel the judgment creditor to revoke the bill of sale and issue a new bill of sale to the highest, fixed-dollar bid.

¶ 2                                    FACTS

¶ 3     The plaintiff, FirstMerit Bank, N.A. (Bank), [1] the successor-in-interest to George Washington Savings Bank, was the judgment creditor in an underlying proceeding against the judgment debtor, the defendant, William McEnery. The Bank had obtained a judgment against McEnery in the amount of $1,843,129.14 on June 10, 2010. On July 1, 2010, the Bank commenced supplementary proceedings by serving a citation to discover assets on McEnery. On January 14, 2015, the trial court granted the Bank's motion for the turnover of the "Kiddyland Train," which was among the personal property owned by McEnery. The Bank was advised that the Kiddyland Train was in the possession of a third party, and the order indicated that there was a storage fee due on the train.

¶ 4     On June 24, 2015, the Bank served a third-party citation to discover assets on the third-party citation respondents, James and William Torrence, pursuant to section 2-1402 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1402 (West 2014)). During the citation examination of James Torrence on December 2, 2015, James stated that he was in possession of property that belonged to McEnery, specifically, the Kiddyland Train contained in three trailers that he had been storing for McEnery. James stated that he expected to be paid for moving and storing the trailers, pursuant to an oral agreement with McEnery. In his response to the citation to discovery assets, James stated, under oath, that he did not have any documents relating to Kiddyland Train, he had not filed a proof of claim in McEnery's bankruptcy proceeding, and he had no documents relating to any claimed liens with respect to any of McEnery's assets. James also stated that he acquired possession of the trailers containing the Kiddyland Train during the second week of July 2013. James stated that, after storing the trailers for eight weeks, he notified McEnery that there would be a storage charge of at least $200 per trailer, per month, if the trailers were not removed immediately. James stated that McEnery agreed to such terms.

¶ 5     The Bank filed a motion for the turnover of the Kiddyland Train against James and William Torrence on December 4, 2017. The Bank alleged that the Torrences had possession of the Kiddyland Train and had refused to allow the Bank to take possession because they were owed storage fees. The Bank contended that the Torrences participated in McEnery's scheme to

---

[1]According to filings in the trial court, FirstMerit Bank, N.A., is now a part of Huntington National Bank.

conceal assets and presented no evidence of an agreement with McEnery for the payment of storage fees. The Bank sought an order finding that the Torrences were not entitled to storage fees and compelling the turnover of the Kiddyland Train. The Torrences filed a response to the motion for turnover, arguing that the motion was premature because the court had not directed a time for the Torrences to file their adverse claim and had not scheduled or held an evidentiary hearing on the Torrences' possessory storage lien. The Torrences asserted that they had a statutory possessory lien.

¶ 6 The trial court entered an order on April 16, 2018, granting the motion for turnover of the Kiddyland Train, free and clear of all liens. The Torrences appealed that order. The order provided that the Kiddyland Train was to be sold in a commercially reasonable manner and the proceeds applied to the Bank's judgment. After competing offers and e-mails, on April 25, 2018, the Bank sent an e-mail to the two people who had previously made bids to purchase the Kiddyland Train—William Wendt and James Torrence—and directed them to submit their highest and best offers in writing by sealed bid to the Bank's counsel by 5 p.m. on April 26, 2018. James Torrence submitted a bid by the deadline for $41,100. Wendt also submitted a bid by the deadline, offering $3500 over the next highest offer. Wendt also contends that the Hesston Steam Museum submitted an offer for $15,000. The Bank issued the bill of sale to Wendt, for the amount of $44,600. James Torrence filed a motion to direct the court to issue the bill of sale to him, arguing that the Bank should treat Wendt's bid as no bid at all, under *Webster v. French*, 11 Ill. 254 (1849). At this point, Wendt filed a motion to intervene in the action, which was granted by the trial court on June 7, 2018. The trial court denied the motion to direct, and James Torrence appealed.

¶ 7                                                    ANALYSIS
¶ 8                                          I. Appeal No. 3-18-0287
¶ 9 In this appeal, the Torrences challenge the trial court's order granting the Bank's turnover motion. The Torrences argue that the trial court erred in granting the motion without permitting them to file an adverse claim and holding an evidentiary hearing. They also claim that the Bank did not prove that it was entitled to relief requested as a matter of law.

¶ 10 As an initial matter, we will address the argument made by counsel for the Torrences that we should not consider Wendt's appellee brief because he was not a party to the case when the turnover order was entered. Wendt was not a party to the case when the turnover motion was granted because Wendt was the purchaser of the Kiddyland Train at the auction following the turnover. However, Wendt's motion to intervene in the case was granted, so he was a party to the case before he filed his appellee brief. Thus, we will consider his appellee brief.

¶ 11 In Illinois, civil judgments may be enforced through supplementary proceedings pursuant to section 2-1402 of the Code (735 ILCS 5/2-1402 (West 2014)). Under section 2-1402 of the Code, a judgment creditor is permitted to initiate proceedings against the judgment debtor or a third party in order to discover assets of the judgment debtor and apply those assets to the debt owed to the judgment creditor. *Id.* § 2-1402(a); *Xcel Supply, LLC v. Horowitz*, 2018 IL App (1st) 162986, ¶ 39. Section 2-1402 of the Code provides a court with broad powers, including the power to order a third party to deliver up assets. 735 ILCS 5/2-1402(c)(3) (West 2014); *Xcel Supply, LLC*, 2018 IL App (1st) 162986, ¶ 40.

¶ 12    Illinois Supreme Court Rule 277 (eff. Jan. 4, 2013) specifies how a supplementary proceeding authorized by section 2-1402 of the Code is to be conducted. Rule 277(e) provides that

> "[t]he examination of the judgment debtor, third party or other witnesses shall be before the court *** unless the judgment creditor elects, by so indicating in the citation or subpoena served or by requesting the court to so order, to conduct all or a part of the hearing by deposition as provided by the rules of this court for discovery depositions." Ill. S. Ct. R. 277(e) (eff. Jan. 4, 2013).

When both the judgment creditor and the third-party citation respondent claim entitlement to the debtor's assets, the trial court should conduct a trial or evidentiary hearing to determine ownership of the assets. *Workforce Solutions v. Urban Services of America, Inc.*, 2012 IL App (1st) 111410, ¶ 41. Such a determination may also be made by summary judgment, or the parties may stipulate to entry of judgment on the pleadings. *Harmon v. Ladar Corp.*, 200 Ill. App. 3d 79, 83 (1990).

¶ 13    However, in order for a dispute to arise for which a trial or evidentiary hearing is necessary, the third-party citation respondent must make a claim on the asset at some point in the proceedings so that there is a factual question to be determined. *Workforce Solutions*, 2012 IL App (1st) 111410, ¶ 42; see *Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277 (2007) (an evidentiary hearing was not necessary in a contested supplemental proceeding when contract could be construed as a matter of law); see also *Urban Partnership Bank v. Winchester-Wolcott, LLC*, 2014 IL App (1st) 133556, ¶ 8 (a turnover order was affirmed where the trial court relied on the parties' arguments and the record and without holding an evidentiary hearing). The Torrences alleged a possessory storage lien in their response to the turnover motion, but they never filed a claim to assert or enforce their purported lien. Liens, though, can only be created by agreement or by statute. *Kunde v. Biddle*, 41 Ill. App. 3d 223, 225 (1976). The Torrences have not pointed to any statute to support their lien and have only alleged an oral agreement to be paid storage fees. Upon service of the citation to discover assets on McEnery on July 1, 2010, the Bank's citation lien attached to the Kiddyland Train. See 735 ILCS 5/2-1402(m) (West 2014); *Bloink v. Olson*, 265 Ill. App. 3d 711, 716 (1994). As James Torrence's responses in the citation to discover assets establish, the Torrences did not acquire possession of the Kiddyland Train until after that date. Generally, a lien that is first in time has priority over subsequent liens against the same property. *Bloink*, 265 Ill. App. 3d at 718.

¶ 14    "The only relevant inquiries in a supplementary proceeding are (1) whether the judgment debtor possesses assets that should be applied to satisfy the judgment and (2) whether a third party is holding assets of the judgment debtor that should be applied to satisfy the judgment." *Gataric v. Colak*, 2016 IL App (1st) 151281, ¶ 15. The Bank had the burden of showing that the citation respondents possessed assets belonging to the judgment debtor. *Schak v. Blom*, 334 Ill. App. 3d 129, 133 (2002) (citing *Mid-American Elevator Co. v. Norcon, Inc.*, 287 Ill. App. 3d 582, 587 (1996)). Since the trial court ruled without conducting an evidentiary hearing, our review is *de novo*. *Kauffman v. Wrenn*, 2015 IL App (2d) 150285, ¶ 15.

¶ 15    In this case, the record, the motion for turnover, and the attachments establish that the Bank had a judgment against McEnery, that the Kiddyland Train was personal property of McEnery ordered to be turned over to the Bank to partially satisfy its judgment, that the Torrences had possession of the Kiddyland Train, and that the Torrences' possession of the Kiddyland Train occurred after the citation lien attached. Under these circumstances, there was no error in the

trial court's order granting the turnover order without an evidentiary hearing.

¶ 16                            II. Appeal No. 3-18-0584

¶ 17        In the second appeal, James Torrence contends that the trial court erred in denying his motion to direct the bill of sale of the Kiddyland Train to him. He argues that the trial court erred by not following the authority of *Webster*, 11 Ill. 254, and rejecting the $3500 over bid as not a bid. Wendt and the Bank contend that there was no auction; the Bank requested interested parties to submit their best offers in writing. They argue that this process was selling the Kiddyland Train in a commercially reasonable manner, as ordered by the trial court. Wendt contends that *Webster* was based upon a unique set of circumstances and was distinguishable. Again, Wendt filed an appellee brief, but this time the Bank also filed an appellee brief, joining and adopting Wendt's brief.

¶ 18        Section 2-1402(e) of the Code allows a court to appoint an agent, in lieu of the sheriff, to sell the debtor's property "upon such terms as are just and equitable," if the nature of the property is such that it is not readily deliverable to the sheriff for public sale or another method of sale is more appropriate. 735 ILCS 5/2-1402(e) (West 2016); *Wells Fargo Bank Minnesota, NA v. Envirobusiness, Inc.*, 2014 IL App (1st) 133575, ¶ 38. Due to the size and difficulty in transporting the train, the trial court did not abuse its discretion in ordering the Bank, rather than the sheriff, to sell the Kiddyland Train in a commercially reasonable manner. James Torrence does not dispute that the method of accepting sealed bids was a commercially reasonable manner to conduct the sale. James Torrence contends, however, that Wendt's bid was illegal, so James Torrence's bid was the highest legal bid.

¶ 19        James Torrence relies solely on *Webster*, 11 Ill. 254. The trial court, however, found that *Webster* was distinguishable. In *Webster*, a law was passed to authorize the governor to sell the Quincy House property. *Id.* at 263. The law directed the governor to accept written, sealed bids and award the bid to the highest and best bid. *Id.* at 264. The Supreme Court found that accepting sealed bids, within a given time, was a distinct kind of sale by auction and the offer of a certain amount of money over bid was not a true bid. *Id.* at 271. *Holliday v. Higbee*, 172 F.2d 316 (10th Cir. 1949), also dealt with a public auction, where the government was the seller. The Tenth Circuit found that the government had no duty to accept a bid of $10 more than any other bid and stated that the bid was not a *bona fide* valid bid at the sale where competitive sealed bids were requested. *Id.* at 318. In another federal case, the "sharp bid" was condemned as destroying the bidding system but decided on the basis that the government acted within its discretion in refusing to accept the bid. *Trump v. Mason*, 190 F. Supp. 887 (D.D.C. 1961). Relying on *Webster*, *Holliday*, and *Trump*, in considering a sharp bid with a private seller, the Minnesota Supreme Court found that sharp bidding by itself was not fraudulent, but concealed sharp bidding was a fraudulent practice. *Short v. Sun Newspapers, Inc.*, 300 N.W.2d 781 (Minn. 1980). The California Court of Appeals agreed that it was the concealed nature of the bid that made it invalid, finding that relative bids were valid when expressly solicited or where such bidding was objectively reasonable as being customary in a particular trade or industry. *Carver v. Teitsworth*, 2 Cal. Rptr. 2d 446, 451-52 (Ct. App. 1991).

¶ 20        Under this precedent, the $3500 over bid, or sharp bid, was not a valid bid unless it is shown that it is customary in the industry. Section 2-1402 of the Code required the sale to be on just and equitable terms. Wendt argues that the sale was just and equitable because the Bank received the highest price for the train. Under the circumstances in this case, where there were

competing offers and the Bank specifically asked those parties to submit their best offers in writing by sealed bid by a specified deadline, the practice of accepting a bid that was not for a specific dollar amount was not just and equitable. First, it was as likely as not that Wendt submitted his "best offer"; if Wendt had submitted a specific dollar amount, it may have been a higher amount so that his bid would be successful. Second, the process unfairly preferred one bidder over another. Since the terms of the sale were not just and equitable, we reverse the order denying James Torrence's motion to direct the bill of sale to him and direct the Bank to issue the bill of sale to the bidder who submitted the highest specific bid—James Torrence.

¶ 21                                                                 CONCLUSION

¶ 22      For the foregoing reasons, the judgment of the circuit court of Will County granting the turnover order is affirmed. The judgment of the circuit court of Will County denying the motion to direct the bill of sale is reversed, and the Bank is ordered to issue the bill of sale to James Torrence.

¶ 23      No. 3-18-0287, Affirmed.

¶ 24      No. 3-18-0584, Reversed.


¶ 25      JUSTICE HOLDRIDGE, concurring in part and dissenting in part:

¶ 26      I agree with the majority's decision that the trial court did not err when it granted the turnover order (appeal No. 3-18-0287). However, I dissent from the majority's (1) determination that the terms of the sale were not just and equitable and (2) decision to direct the Bank to issue the bill of sale to the bidder who submitted the highest specific bid (appeal No. 3-18-0584). Viewing a bidder's role in an auction in a pragmatic manner demonstrates that bidders only have the right to delivery. This right is triggered when the bidder has satisfied the terms of the auction, *i.e.*, in this case, by submitting the "highest and best offer." The bidder's participation in an auction constitutes the bidder's consent to the auction's terms. In this case, the parties submitted bids to the Bank, thereby agreeing to the terms of the auction, namely, that the highest and best bid would be the winning bid. Wendt submitted the highest and best bid and was entitled to delivery.

¶ 27      For the foregoing reasons, I would affirm the trial court's judgment in its entirety.