# EQUITABLE HOLDING COMPANY v. EQUITABLE BUILDING & LOAN ASSOCIATION AND OTHERS.[1]

April 29, 1938.

No. 31,541.

[1]Reported in 279 N. W. 736.

530

*Shearer, Byard & Trogner,* for appellants.

*Doherty, Rumble, Butler, Sullivan & Mitchell* and *Edward Cohen,* for respondent.

JULIUS J. OLSON, JUSTICE.

The corporate defendants have appealed from an order denying their alternative motion for amended findings or new trial. The action as originally brought was against Equitable Building & Loan Association, a corporation, and the commissioner of banks as its statutory liquidator. Later the other corporate defendant, Peoples Realty & Mortgage Company, came into the case; and, pursuant to certain agreements and stipulations, it was agreed that "any claim which may be finally established in plaintiff's favor in this action, shall be deemed a claim asserted against said Peoples Realty & Mortgage Company, as trustee for the benefit of the creditors" of the association and its stockholders and is "to be paid by said trustee out of the said assets and property segregated and transferred to it as trustee." The commissioner of banks did not join in the ap-

peal, but appellants duly served upon him a notice of appeal. He has, however, made no appearance here. We shall therefore hereafter refer to the building and loan association as defendant, the entire difficulty here for decision being between plaintiff and the association.

On February 17, 1925, plaintiff and defendant entered into the contract upon which the present controversy pivots. The provisions thereof may be summarized thus: Plaintiff agreed to pay "all the operating expenses" of defendant, "including the salaries of officers thereof, commissions to salesmen, and all expenses of any nature whatsoever incident to the carrying on of the building and loan business for the period and under the conditions" thereinafter stated. In consideration thereof defendant promised: (1) To pay plaintiff "all membership fees and loan commissions charged" to its subscribers of stock and borrowers; and (2) that it would pay plaintiff "at the end of each month a percentage of the cash value of its assets" as follows: one-fourth of one per cent of the book value of all assets up to and including $1,000,000, and one-sixth of one per cent of the book value of all assets in excess of that amount. The agreement was to "remain in force during the life" of defendant's charter "and any renewal thereof." It also agreed to charge and collect membership fees on "installment" and "running" shares at the rate of two per cent of par value, and there was to be no reduction of these unless both parties to the agreement consented thereto.

The agreement was later modified so as to provide that payments to be made plaintiff under the second subdivision thereof "should not exceed annually an amount equal to two and one-half (2½) per centum of the total amount of stock payments actually received and to the credit of the members of defendant * * *, including dividends declared and credited thereon." Again, in March, 1931, it was modified so as to provide that payments to be made thereafter should not "exceed annually an amount equal to two and one-half (2½) per centum of the total amount of all money actually received and loaned to members * * * on real estate mortgages and contracts for deed."

532

The contract was substantially complied with by the parties, who operated in accordance with its terms over a period of nearly ten years, *i. e.*, from February 17, 1925, until defendant went into liquidation June 30, 1934. While it is conceded plaintiff never paid to or for defendant's use any interest by the latter paid for borrowed money, whether evidenced by notes or certificates of indebtedness, nor expenses on real estate acquired in the course of its business, nor taxes thereon, the fact remains that these disbursements were not charged by defendant to plaintiff on its books, nor did it at any time demand or request that plaintiff pay any of them. Also significant in this regard is the further fact that defendant, during all this time, was under the law subject to periodic examination by the banking department and was so examined at least 15 times; and to its board of directors that department periodically submitted its reports and criticisms. The board as such was required to answer in writing questions therewith submitted. These reports of examinations showed the ordinary operating expenses of defendant to have been paid by the plaintiff. Each thereof contained reference to this contract, and written answers from defendant showed plaintiff was not paying the disbursements made by defendant respecting interest, expense of maintaining real estate, and taxes. Neither the department nor defendant's board ever questioned the legality of the contract, nor did anyone as much as suggest that the disbursements here mentioned should be met by plaintiff.

Important, too, during this time defendant "earned and paid or credited to its stockholders $114,793.27"; and its assets "were built up so that * * * on December 31, 1931, they aggregated $670,000, and on June 30, 1934, $551,466.07," on which last mentioned date the undivided profits were listed at $11,372.64, its fully paid stock $100,000.

On the evening of June 24, 1934, a meeting of defendant's board of directors was held, where, by a bare majority vote, a resolution was adopted immediately to close defendant's doors; also requesting the commissioner to take immediate possession and control of its business, property, and assets for liquidation. "One reason" for

this (and apparently the compelling one), quoting the findings of the court, "was to rid defendant association of its said contract with the plaintiff." Immediately thereafter the commissioner took charge and proceeded to liquidate its affairs. He refused to make any payments under the terms of the contract or to carry out any of defendant's obligations thereunder, whereupon plaintiff filed its claim with him for allowance amounting to some $45,000. This contract and its violation were made the bases for the claim. It was rejected, and this action followed.

During the period of operation plaintiff had paid under the terms of its agreement $166,137.77; its receipts during that time from defendant were $121,027.84. From other sources, deemed by the court to be appropriate credits, plaintiff received $9,447.57, thereby making its gross income to be credited $130,475.41. This left a balance against defendant of $29,588.01. But the court gave defendant an additional credit of $2,500 for bookkeeping services rendered to plaintiff and for space used by its officers, etc., thus leaving a net balance of $27,088.01. In this amount, with interest since March 16, 1935, it directed judgment for plaintiff.

With the foregoing facts before us and were we to assume this identical issue to be between private persons, no difficulty would be encountered in sustaining the conclusion reached by the court. Is there any sound reason in law, logic, or morals for not permitting the same result to obtain where the parties are corporations?

Defendant's real fight against imposition of liability is centered around the following points: The contract is void because (1) *ultra vires;* (2) against public policy; and (3) contravenes express statutory provisions. We shall therefore take up the issues thus presented in the order mentioned.

■ On the subject of *ultra vires* much has been written. Under our statutes as they were when the contract was made, nothing has been pointed out to us as prohibiting in so many words or by necessary implication the making of such a contract. The apparent purpose of its making was to facilitate defendant's early functioning as a going concern in its chosen field. There was then no requirement that any of its capital stock as a building and loan association

should be paid in prior to the time of commencement of its active operation. That first came into our statutes by L. 1925, c. 260, 2 Mason Minn. St. 1927, § 7751, and by its terms made applicable to associations "hereafter authorized to transact business." To organize and to function it was of course necessary to incur expenses. Offices necessarily had to be rented, personnel employed, advertising and many other items of expense had to be incurred. So, to initially finance the enterprise, it necessarily followed that some method had to be employed to meet these burdens. Before defendant could get on its feet and build up a sufficient business volume to be self-sustaining some means had to be found to finance it. The fact that such contracts had been and were in fairly common use is indicated by L. 1933, c. 102 (3 Mason Minn. St. 1936 Supp. § 7758-1), which provides:

"No building and loan association, now or hereafter organized under the laws of this state, shall hereafter be permitted to pay or agree to pay to any person or corporation an agreed percentage of its stock payments or other assets, or make any payment whatsoever, in consideration of the payment by such person or corporation of the expenses of such building and loan association either in whole or in part. The intent of this act is that building and loan associations shall pay their actual expenses within the limitations imposed by law, directly to their creditors, and not through the medium of third parties; *but this act shall not apply to existing contracts or to payments made or to be made pursuant thereto.*" (Italics supplied.)

A reading thereof indicates in no uncertain terms just what was aimed at. If the involved contract had been made after the adoption of this enactment no one would question the validity of defendant's position here. But by its terms, "this act shall not apply to existing contracts or to payments made or to be made pursuant thereto," the legislature in so many words recognized not only the existence of such contracts as the one we have here, but also their potential validity. At least no legislative policy is declared assailing their full worth as contractual engagements. The practical

construction of pertinent legislative acts on the part of the banking department lends aid to the view that there was no legal objection to such arrangements. Upon that department rested the duty to "investigate the methods of operation and conduct" of defendant and "to ascertain whether such methods and systems are in accordance with law." 1 Mason Minn. St. 1927, § 5323. See also 2 Mason Minn. St. 1927, §§ 7640 and 7688.

"Great weight is attached in construction to contemporaneous exposition. The practical construction placed on a statute by executive or administrative officers, or the legislature, and long acquiesced in by the people, is entitled to great weight with the courts. Especial deference is paid to executive construction." 6 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) § 8952, and cases under notes 69, 70, and 71.

Courts should not, nor do they, look for excuses or loopholes to avoid contracts fairly and deliberately made, whether such be by individuals or corporations.

"It may be stated as a general rule that every corporation has power to make all contracts that are necessary and usual in the course of the business it transacts, as means to enable it to effect such object, unless expressly prohibited by law or the provisions of its charter. * * * *Prima facie*, the contracts of corporations are valid. There is no presumption of excess of power attaching to them, and the burden of showing they should be avoided is on the impeaching party." 7 R. C. L. p. 589, § 580. Hence it has been said that "a corporation, like a natural person, has a right to conduct its legitimate business by all the means necessary to effect such object. Within its prescribed range, it can do whatever a natural person *mutatis mutandis* could do." *Id.* p. 528, § 513.

■ Is the involved contract one "against public policy" and for that reason void? Ordinarily the "public policy of the state should be determined by the legislature and not by the courts." This is illustrated in Power v. Nordstrom, 150 Minn. 228, 232, 184 N. W. 967, 969, 18 A. L. R. 733, and the many cases therein cited. Grant-

ing that affairs of building and loan associations are subject to the police power of the state, yet we think that where, as here, the legislature has recognized third party contracts of this type as valid (L. 1933, c. 102) courts should not say as a matter of law that such engagements violate our public policy.

"It would be unwise to attempt an exact definition by which to determine whether a contract is or is not void as against public policy. But it may be stated generally that a contract is not void as against public policy unless it is injurious to the interests of the public, or contravenes some established interest of society. * * * It is of paramount public policy not lightly to interfere with freedom of contract. * * * It must not be forgotten that the right of private contract is no small part of the liberty of the citizen, and that the usual and most important function of courts of justice is rather to maintain and enforce contracts than to enable parties thereto to escape from their obligation on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare." 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) § 1870, and cases under notes 9, 11, and 12.

■ We do not believe the contract contravenes any express provisions of applicable statutory law. Examining its provisions in the light of then existing statutes fails to disclose that amounts paid or payable thereunder were calculated upon any basis beyond granted authority. Analysis of the 1925 act discloses: (1) That operating costs are to be deducted from earnings every six months; (2) if income is not sufficient to accomplish this purpose the excess of such costs or expenses is to be deducted from the earliest available net profits; (3) no such deductions shall be made from stock payments; (4) such expenses and costs shall not exceed annually two and one-half per cent of the total amount of stock payments actually received and to the credit of the members of the association at the time of making such deductions. From this it is apparent that the legislative purpose was primarily to prevent the withdrawal of more than the mentioned percentage of the assets from its earnings for operating expense. The contract in its prac-

tical operation does not require the deduction of or payment to plaintiff of more than the percentage fixed by statute. Within these limits the payments were made, but they were inadequate to meet in full the amount plaintiff had to meet under its contractual promises. As defendant has become incapable of proceeding with performance, the question presented is whether this relieves it from all liability to make good plaintiff's loss.

As we have seen, when this contract was made there was no statutory prohibition in respect to this form of contractual engagement. The limitation upon which defendant relies came into being by the 1925 act, labeled an act "revising, amending, consolidating, and rearranging the laws" relating to building and loan associations. Nowhere is there anything said indicating that existing contracts were to be annulled or limited in their scope and effect. Rather the contrary appears. The first section thereof (2 Mason Minn. St. 1927, § 7748) reads in part:

"Until otherwise provided by law all existing financial corporations conducting the business of building and loan associations at the time of this act taking effect shall continue to exercise and enjoy all powers and privileges possessed by them under their respective articles of incorporation and the laws applicable thereto then in force not inconsistent with the provisions of this act, *and shall remain subject to all duties and liabilities to which they were then subject.*"

Section 8 has to do with payment of dividends. In substance the provision is that at least semiannually the association, before payment of dividends, must first deduct from its income its operating costs if the profits are sufficient therefor. If not sufficient, the expenses "above the profits, shall be carried on the records of the association as 'expenses paid,' and thereafter deducted from the earliest available net profits. *Such balance shall be charged to an account called 'permanent expenses,' and finally be paid by the proportionate deduction from the value of the shares upon the books of the association.* The remainder shall be deemed the true book value of said stock. * * * Expenses met by service fees, in-

cluding membership, shall not be considered as operating costs subject to the limitation of expense herein provided." (Italics supplied.)

The obvious purpose of the quoted provision was to protect the creditors whose money had gone into the enterprise in that fashion; otherwise why should a "permanent" expense account be set up to be finally "paid by the proportionate deduction from the value of the shares upon the books of the association?"

■ Defendant claims the evidence does not sustain the cause of action pleaded. The complaint does however state all facts upon which reliance is based for recovery. Perhaps the complaint may be characterized as a double-barreled affair. Be that as it may, the recovery permitted is well within the facts pleaded and found to be true. The labeling of a complaint to characterize it is unnecessary and improper. The vital question is whether the facts set out are such as to justify judicial relief. The nature of the cause must be determined by the facts alleged and not by the formal character of the complaint. Hence recovery may be had if the facts proved within the allegation of the pleading are justified, although the pleader might be mistaken as to the nature of his cause. 5 Dunnell, Minn. Dig. (2 ed.) §§ 7526a and 7528b, and cases cited under notes. Here by pleading and proof it unequivocally appears that plaintiff has paid out under the terms of its contract at least the sum of money allowed by the court in excess of all of defendant's available credits. Restitution as far as was possible under the circumstances is all the court allowed. Defendant is in no position to complain. After all, "neither law nor morals forbids a corporation to repay what it has obtained or borrowed from another even though obtained or borrowed *ultra vires*. In fact the authority cited by plaintiff suggests that the corporation thus enriched by the funds of another may be compelled to return or restore the same in an action for money had and received." Williams v. Davis, 182 Minn. 186, 190, 234 N. W. 11, 13. Helpful, too, is Turner v. Valley Nat. Farm Loan Assn. 182 Minn. 115, 233 N. W. 856.

■ It is said and urged as a basis for defendant's claim of non-liability that through and by means of interlocking directorates and executive officers they were "at all times" but "parts of a single enterprise under control of" plaintiff. The trouble with defendant's position is that the court found otherwise, and the record sustains that view. While there was some interlocking of officers and directors, the majority of defendant's board was not tied up in any way with plaintiff. Fraud and overreaching are not in the case. We fail to find any abdication or surrender of power or discretion on the part of defendant's board of directors. That defendant has received the advantages of plaintiff's funds to the extent allowed by the court cannot be denied. Under the circumstances here shown, we can see no just reason for arriving at a conclusion opposite to that reached below.

■ The court allowed plaintiff interest from the time the commissioner disallowed the claim. Of this, too, defendant bitterly complains. It is elementary that stockholders of a corporation have interests subordinate to the rights of the corporation's creditors. We can see nothing wrong about such interest allowance. Defendant's liability is no less or different now because of the trust arrangement than it would have been without it. By that agreement "any claim which may be finally established in plaintiff's favor" is "to be paid by" defendant's trustee out of "assets and property segregated and transferred to it as trustee  *  *  *."

A debtor's obligation to pay interest as damages for detention of the debt is not cut off by suspension of business or receivership. The reason why interest is generally disallowed in bankruptcy and other similar proceedings is that equality among general creditors as of date of insolvency is thereby attained. But "where the ideal of equality is served" interest is properly allowed. Compare Ticonic Nat. Bank v. Sprague, 303 U. S. 406, 58 S. Ct. 612, 82 L. ed. —. The cases are annotated in 39 A. L. R. 457, and 44 A. L. R. 1170. As between plaintiff, a creditor, and the association's stockholders, there can be no doubt of the former's priority and consequent right to recover interest.

There are other assignments of error, but these we think do not require discussion.

Order affirmed.