# WM. D. PERKINS v. F. N. HEGG.[1]

May 8, 1942.

No. 33,179.

*A. L. Hankowsky,* for appellant.
*T. M. Erickson,* for respondent.

HILTON, JUSTICE.

The single question presented by this appeal from a judgment entered pursuant to an arbitration award is whether an enrollment agreement with and membership registration in the property tax reduction club are violative of public policy. Sought to be avoided here is the payment of dues. The club was organized in 1931 as a charitable corporation for the declared purpose of promoting legislation and education designed to reduce property taxes and to substitute therefor taxes not destructive of property values. Management was given to trustees who were elected from life members. The enrollment of and dues for nonlife members was authorized by the articles and prescribed by the by-laws.

Appellant became a member of the club by subscribing to an enrollment agreement executed September 30, 1931. Therein, he enrolled as a "Tax" member, paid a two-dollar membership fee, and

[1]Reported in 3 N. W. (2d) 671.

"in lieu of all dues until 1936," fixed at two dollars per month by the by-laws, appellant "agree[d] to pay to you or order half the amount of property taxes I save during the first tax year or year you designate after the enactment of any Minnesota law or laws reducing property taxes, if before 1936, * * *." In addition to promising to pay dues, appellant agreed to furnish a legal description of his property upon request. He did neither. After joining, he took no active part in the organization but never made any effort to resign.

The award imposed liability upon appellant for two amounts, $29.70, representing one-half of his property tax saving for 1935, and $58.60, representing unpaid dues from January 1, 1936, to June 9, 1938, the expiration day of the original charter.

In effectuating its purpose of substituting taxation upon a more equitable basis for oppressive real property levies, the club engaged widely in educational and informational activities. In the press, over the radio, through lectures and questionnaires, and by other recognized methods of communication, a program of public enlightenment upon the subject of property taxation was conducted. The political effectiveness of the club depended wholly upon its capacity to send publicity containing its views to every part of the state. Unless the legislators could become apprised of a public sentiment adverse to current tax methods, the organization could scarcely be more than a handful of ineffective dissenters. Necessarily, the extent of its financial support would largely determine the success of the educational program. Having no capital stock or other assets, the club was financed solely from the dues of members and whatever contributions it received. Upon dissolution, remaining funds were to be distributed pro rata to members, or used to further the purposes of the club, or distributed to specified charities.

It is contended that the enrollment agreement upon which the award was based is contrary to public policy and should not be enforced. Contracts, the subject, operation, or tendency of which violates public policy or the established interest of society, are not

enforceable. 12 Am. Jur., Contracts, § 167; Equitable Holding Co. v. Equitable B. & L. Assn. 202 Minn. 529, 536, 279 N. W. 736. However, freedom of contract should not be unduly restricted by ill-advised application of a doctrine necessarily rather vague and uncertain in its limitations. See Granger v. Craven, 159 Minn. 296, 299, 199 N. W. 10, 52 A. L. R. 1356. Before a charge of invalidity should be upheld, either law or precedent should mark out clearly that a particular contract violates public policy, or at least a court of justice should with certainty be able to say that enforcement of the contract would be hurtful to the public welfare. This is not a field for the play of individual notions of public policy. Rather, it is only those indisputable public interests standing in opposition to what the contract seeks to accomplish that should be permitted to strike down its enforceability.

Certainly, there is no public policy which requires this court to refuse enforcement of appellant's agreement to pay dues to the property tax reduction club. Appellant has failed in his task of bringing this agreement within that group of cases refusing to enforce contracts to receive compensation for obtaining the passage of favor legislation or influencing government officials in a manner personally advantageous to the promisor. Houlton v. Dunn, 60 Minn. 26, 61 N. W. 898, 30 L. R. A. 737, 51 A. S. R. 493; Goodrich v. N. W. Tel. Exchange Co. 161 Minn. 106, 201 N. W. 290; cf. Hollister v. Ulvi, 199 Minn. 269, 271 N. W. 493. Because of their tendency to corrupt, such contracts are bad even apart from a consideration of whether improper means were employed in the particular case.

But in no respect was appellant's promise to pay dues a promise to pay compensation to the club for obtaining tax reduction by use of personal influence with legislators. The club was a non-profit organization which used its funds in support of its statewide educational program against property taxes. It was stipulated before the arbitrator that the "Club's work was educational, charitable and reformatory of taxation methods, exclusively. It maintained no legislative agents or lobbyists, and did nothing to,

380

or tending to, improperly or corruptly influence legislators or legislation." That being true, it requires no extended argument to demonstrate that the evils inherent in contracts of the type just referred to are not present in an organization which through the democratic process of appeal to reason is attempting to stimulate an inarticulate public sympathy for tax reform into a dynamic, forceful, political movement. It is not for us to pass upon the propriety of the particular program sponsored by the club. It is enough to say that there is no room for the contention that the club's objectives were inimical to the public good. So to hold as to this organization would require a similar rule as to labor unions, pension groups, and all other associations interested in stimulating public support for their particular program of legislative reform. Far from violating public policy, it is essential to the effective functioning of democracy that like-minded citizens be permitted to organize and to persuade the public to support their particular drive to effect the ebb and flow of the legislative waters.

Judgment affirmed.