Robert E. SHORT, Appellant,

v.

SUN NEWSPAPERS, INC. et al., Carroll E. Crawford, Vincent J. Manno et al., Elmer L. Andersen et al., Respondents.

No. 50736.

Supreme Court of Minnesota.

Dec. 19, 1980.

William Busch, St. Paul, Foster, Jensen & Short, Minneapolis, for appellant.

Faegre & Benson, Lawrence Brown and Brian O'Neill, Minneapolis, for Sun Newspapers, Inc., et al.

Henson & Efron and Alan C. Eidsness, Minneapolis, for Crawford.

Mackall, Crounse & Moore, Minneapolis, for Manno, et al.

Briggs & Morgan and Frank Hammond, St. Paul, for Andersen, et al.

SIMONETT, Justice.

Plaintiff Robert E. Short sued Sun Newspapers, Inc., and others on three counts: for specific performance of a contract to sell certain assets of Sun's newspaper business; for damages for breach of the contract; and for wrongful interference with plaintiff's contractual relationship with Sun.[1] Defendants first moved for judgment on the pleadings, which was denied. After discovery depositions were taken, both plaintiff and defendants moved for summary judgment. By its order of April 29, 1979, the trial court granted summary judgment in favor of all defendants. Plaintiff appeals from that judgment. We reverse.

The facts need to be set out at some length. Sun had started an antitrust action against the Minneapolis Star and Tribune. As part of a settlement of that action the two parties entered into a written agreement, dated September 29, 1978, whereby Star and Tribune would purchase the controlling stock interest in Sun held by its president, Carroll E. Crawford, but on the condition that Sun would first sell off its newspaper division assets. The sale was subject to the approval of the Justice Department. The proceeds of the sale of the newspaper business would go, ultimately, to Star and Tribune.

Paragraph 6 of the settlement agreement established procedure to be followed for the sale. Star and Tribune was to submit to Sun the names of three experienced newspaper brokers, and Crawford, for Sun, was to select one of the three to act as broker. The assets to be sold were "all of Sun's newspaper business, including its free circulation newspapers, but not Sun's directory, printing, or other business," and a list of the assets to be sold was attached. The list did not include any physical assets. The sale was to be for cash plus assumption by the buyer of all accrued vacation pay liability for Sun's employees who stayed with the new owner. Further, "Crawford shall cause Sun to accept * * * the highest bid obtained by such broker during the period ending on the sixtieth (60th) day after the Deposit Date." The sale was to be closed no later than December 31, 1978.

Of the three names submitted by Star and Tribune to Sun, Crawford selected Vincent J. Manno Company as the broker. On October 19, 1978, Manno and Sun signed an exclusive brokerage agreement wherein Manno had until November 28, 1978, to "exercise its best efforts in obtaining bids from potential buyers of said Newspaper Business and of said Magazine Distribution Business." Further—

> [B]ids shall state (a) the purchase price which such purchaser offers to pay for said Newspaper Business, and (b) the purchase price which such purchaser offers to pay for said Newspaper Business and said Magazine Distribution Business combined.

Then, after providing for a certified check of $5,000 to accompany each bid and providing that "Broker shall only accept offers from potential purchasers" for cash plus the accrued vacation pay liability of Sun's personnel, the brokerage agreement went on—

> On the first business day following the Final Bid Date, the Broker shall review the bids with Crawford. At such time, Crawford shall make the decision as to whether Sun shall sell only the Newspaper Business, or shall sell both the Newspaper Business and the Magazine Distribution Business. In the event that *Craw-*

---

1. In addition to Sun Newspapers, Inc., plaintiff sued Carroll E. Crawford, president and chief stockholder of Sun; Vincent J. Manno Co. of New Canaan, Connecticut, the firm which acted as broker for the sale of the newspapers, and its representative, Gerald Reilly; Minneapolis Star and Tribune Company, purchaser of Sun's stock interest; and Elmer L. Andersen, the successful bidder at the sale, and his corporation which took over the purchased business, Minnesota Suburban Newspapers, Inc.

The first count of plaintiff's complaint for specific performance is against Sun and Crawford. The second count for money damages for a contract breach is against defendants Sun and Crawford; and the third count for contractual interference is against all defendants. A fourth count asks for exemplary damages against all defendants.

*ford determines* that Sun shall sell only the Newspaper Business, *the purchaser of the Newspaper Business shall be the potential purchaser which has offered the highest offering price for said business*; in the event that Crawford determines that Sun shall sell both the Newspaper Business and the Magazine Distribution Business, the purchaser of the two businesses shall be the potential purchaser which has offered the highest offering price for said businesses. The purchaser, so selected, shall hereinafter be referred to as the "Purchaser." [Emphasis added.]

Gerald Reilly, a representative of Manno, went to work to find prospects. His job was complicated by certain facts: He was selling only "soft" assets; the purchase price had to be cash; and the deadline was short. From time to time Crawford made suggestions to Reilly on how to make the sale more attractive. Thus he suggested to Reilly that a Goss Urbanite printing press then being used to print Sun's newspapers might be available for sale. This, however, was a tangible asset which would be owned by Star and Tribune under the settlement agreement, and its acquisition would require separate dealing with Star and Tribune. Crawford also suggested to Reilly that financing terms might be offered to potential purchasers, such as by delays in Star and Tribune's billings for printing or by the purchaser collecting the receivables. Reilly "envisioned something quite informal in the bid procedure."

Reilly also talked to people at the Star and Tribune, because the successful purchaser, if he did not immediately move the business elsewhere, might need to make arrangements with the Star and Tribune for rental of space and facilities in the Sun building and might need to continue the printing contract with the Star and Trib-

une. On November 20, Reilly sent a mailgram to seven prospects, including Andersen but not Short, outlining "bid procedures."[2]

On October 31, 1978, Elmer L. Andersen talked by phone with Reilly, having been referred to Reilly by Charles Arnason of the Star and Tribune. This was the first of many conversations between Reilly and Andersen over the next few weeks. Reilly furnished Andersen with production and rental figures and indicated to Andersen the Goss Urbanite press might be available. On November 21, Reilly told Andersen that Andersen could elect to bid for the press, but that it would be best to have the press price separately stated. On November 27, Andersen called Reilly and read a rough draft of his bid, and thereafter Andersen submitted his bid to Reilly at his New Canaan, Connecticut, office.

Short first indicated an interest in the proposed sale when he called Crawford on or shortly after November 8. On November 10, Crawford wrote Short a letter stating:

> There are no hard assets included. The Star, who will be buying our printing plant, will agree to print and compose for a new owner and also provide office space. I would recommend that a new owner office and compose elsewhere and just have the Star do the printing. Even this would not be necessary. If the Star didn't do the printing, they might also be interested in selling the press that we use to print the newspapers.
>
> \*    \*    \*    \*    \*    \*
>
> The newspapers will be sold on or before November 28 to the highest bidder \* \* \*.

Thereafter, Short conferred at times with Reilly as well as with Crawford and the attorney then representing Crawford. On

---

**2.** The mailgram said:

With reference to bid procedure for Sun Newspapers, be advised that bid is to be a letter addressed to this office containing the following information:

1. Amount proposed to pay;
2. Terms of payment;
3. Description of what your bid covers;
4. Time schedule for takeover;
5. Any clarifying statement required to *explain your bid proposal*;
6. Certified check in amount of $5,000 made out to Sun Newspapers, Inc. which shall be applicable to purchase or returned if not accepted.

November 25, Crawford gave Short, at Short's request, a copy of the brokerage agreement, since Short wanted to know the exact terms of the bidding procedure. By November 28, Short had tentatively decided to submit a bid. He had decided to bid in the form of "X dollars more than the highest bid received to a maximum of so many dollars." Short called both Crawford and Sun's attorney on the phone, explained the form of his bid, and testified he was told by both this would be fine and would be an acceptable and conforming bid, although Short understood neither was giving an opinion as to the legality of the bid form.

As a result of a telephone conversation between Short and Reilly on either Friday, November 24, or Saturday, November 25, Reilly agreed the deadline for bids would be 5 p. m. Tuesday, November 28; that the bids could be accepted at the office of Sun's attorney in Minneapolis as well as at New Canaan; that the bids would be read in Minneapolis the next morning, Wednesday, November 29; and that Short's bid would be opened last. At this time, Short knew that Reilly already had three bids in hand. At 4:55 p. m. on Tuesday, Short submitted his bid.

On Wednesday morning, the bids were opened in a law office in Minneapolis, with all parties either present or represented by counsel. Reilly participated from New Canaan by conference phone. There were five bids, which, in the order opened, were:

C–1–$5,000, which was also the accompanying good faith deposit

["C" stands for Connecticut and "M" stands for Minneapolis.]

C–2–$100,000, with no good faith payment

C–3–$1,410,000, allocated $1,100,000 for the newspaper and $310,000 for the

Goss press, plus other terms, and accompanied by a $5,000 good faith deposit [the Andersen bid]

M–1–$10,000 bid, with a $5,000 good faith deposit

M–2–$25,000 more than the highest bid received, with a maximum of $500,000, and with a $5,000 good faith deposit [the Short bid]

A difference of opinion immediately arose. Was the Andersen bid, although the highest, to be ignored as nonconforming?[3] Was the Short bid then the highest bid, or was it to be ignored as "illegal"? Andersen then stated his bid was severable and agreed to delete the Goss press. The conference recessed until the afternoon, when Sun's counsel indicated in his opinion the bid should be given to Short. The Star and Tribune then handed a letter to Crawford stating that deletion of the Goss press by Andersen from his bid was proper, Andersen having reserved the right in his bid to make adjustments; that the Star and Tribune was willing to sell the Goss press to the C–3 bidder once the Star and Tribune had acquired Sun's stock; and that "it is our opinion that the bid designated C–3 constitutes the highest bid in accordance with and under the terms of paragraph 6 thereof, and in fulfillment of the provisions thereof, and that said bid must be accepted."

Crawford asked Star and Tribune for an indemnity agreement if Sun and he accepted the Andersen bid. The agreement was given. Crawford then, on Sun's behalf, accepted the Andersen bid of $1,100,000. The sale to Andersen was completed on December 22, 1978, governmental approval having been obtained. In April 1979, Andersen purchased the Goss press from Star and Tribune for $310,000.

---

**3.** The Andersen bid, in addition to including the Goss press, also contained, among other things, a requirement that the purchaser, "if requested by Seller" would, for a period of 90 days, collect Sun's account receivables as Seller's agent with the right to use the proceeds for the 90 days without interest. Also, Sun and Crawford would agree not to compete with the Buyer for 5 years, and Seller would obtain the requisite governmental approvals.

Further, "Acceptance of this offer shall be made in writing * * *. Acceptance must be made on the exact terms hereof * * *"; also, "If this offer is not properly responsive to the required terms under which the newspaper assets and business of Sun Newspapers, Incorporated are being offered for sale, we ask that you notify the undersigned immediately of the particulars and grant him the opportunity to amend his offer."

## The Issues on Appeal

The trial court found there was no genuine issue of fact, that no contract existed between Short and Sun, and granted defendants summary judgment.

The court found as a matter of law that Sun's invitation for bids was only an invitation to make an offer and not in itself an offer. This being so, Andersen was free to amend his original nonconforming offer and, as amended, he was the highest bidder and entitled to the Sun contract. In any event, said the court, Short's bid, "X dollars over the highest bid," commonly called a "sharp bid," was unfair, contrary to public policy and void, so Short could have no contract. Thus the issues here are:

(1) Was Sun's bid solicitation as a matter of law an offer or only an invitation to make an offer?

(2) Is a sharp bid in a sealed bidding procedure void?

In addition, one other issue was presented for resolution. The trial court refused to award defendants, as the prevailing parties, their expenses for disbursements incurred in procuring copies of depositions taken by plaintiff. Defendants contend such costs should be allowed. Since we reverse, this issue is not reached.

## An Offer or an Invitation to Make an Offer

■ Whether an invitation for bids is an offer rather than an invitation to make an offer depends on the intention of the parties and the surrounding circumstances, but "where the offer is clear, definite, and explicit, and leaves nothing open for negotiation, it constitutes an offer, acceptance of which will complete the contract." *Lefkowitz v. Great Minneapolis Surplus Store, Inc.*, 251 Minn. 188, 191, 86 N.W.2d 689, 691 (1957). There the store advertised in the newspaper to sell "1 Black Lapin Stole * * worth $139.50" for one dollar, "First Come. First Served." This was an offer to sell the stole at a time and date certain for a stated price to the first person who came. It was

held plaintiff, as the first person to appear, had a contract. The store's proposal was clear, definite and explicit and there was nothing to negotiate. The advertisement was held to be an offer.

If Sun's invitation for bids was the "mailgram" Reilly sent to prospects outlining the bid procedure, plainly, as the trial court observed, it was not a clear, definite and explicit offer. The "mailgram" asked the bidder to describe what his bid covered, invited "any clarifying statement," and was generally silent as to any specifications to which a bidder would have to conform.[4] Language in the brokerage agreement is also indicative of only an invitation to make an offer: "Broker shall exercise its best efforts *in obtaining bids from potential buyers*"; and "bids shall state the purchase price which such purchaser *offers* to pay." (Emphasis added.) Moreover, much of the surrounding circumstances support the view that Sun was only soliciting offers. Its agent, Reilly, for example, understood he was "soliciting prospective buyers to come with an offer which we could recommend to the owner, Mr. Crawford," and he told Andersen if he received a bid of $2,600,000 he would terminate contacts with other bidders. Andersen's bid starts out, "The undersigned * * * offers to purchase."

On the other hand, Short maintains he was told by Reilly that the business was to be sold to the highest cash bidder; that there was a deadline of November 29; that Crawford and nobody else could make the decision as to who was the high bidder; and that only "soft" assets were to be sold. Short understood "soft" assets to mean the "masthead," *i. e.*, the name, subscriber and advertising lists, and contracts for legal publications, but no tangible assets. Short knew about the Goss press but understood it would have to be purchased separately from the Star and Tribune and, in any event, he was exploring other means of printing. Coupled with this is Crawford's letter to Short of November 10, confirming no hard assets were included in the sale and the newspaper would be sold to the highest

4. *See* footnote 2, *supra.*

bidder, with Crawford having the responsibility of making that selection.[5]

Because Short was uneasy that his bid would not receive full consideration, he insisted, and Reilly agreed, that bidding would be by sealed bids submitted by a specified time and with a public opening. Short claims Reilly also told him, "In an ordinary newspaper sale of this type, what we do, we get these things in here, and then we can sit down and negotiate. But we are precluded from doing this * * *. No way could there be any negotiation after the bids are opened * * *. If you are the high bidder, you are going to get that newspaper." This jibed with the language of the settlement agreement, "Crawford shall cause Sun to accept * * * the highest bid," and the language of the brokerage agreement which Short checked before he bid, "[T]he purchaser of the Newspaper Business shall be the potential purchaser which has offered the highest offering price for said business." It was never stated in the written agreements or otherwise that the seller reserved the right to reject any bids.

■ Defendants cite *Anderson v. Wisconsin Central Railway*, 107 Minn. 296, 120 N.W. 39 (1909), where it was held that an announcement to sell at public auction to the highest bidder is only an invitation for bids and a bid is an offer. The Uniform Commercial Code, however, has changed this rule to provide that a request for bids at auction is presumed a solicitation for offers *unless* it is stated to be "without reserve." Minn.Stat. § 336.2–328(3) (1978). The phrase "without reserve" is not a formal requirement, just customary at auctions, and equivalent language will have the same effect. An announcement that goods will be sold "to the highest bidder" is said to be the equivalent. Restatement of Contracts, § 27, *illustration* 3 (1932); H. Hoshour, *Bids as Acceptances in Auctions "Without Reserve,"* 15 Minn.L.Rev. 375, 389 (1931). *See also Jenkins Towel Service, Inc.*

*v. Fidelity–Philadelphia Trust Co.*, 400 Pa. 98, 161 A.2d 334 (1960). Thus Williston says:

> Except in the case of municipal or public corporations under such disabilities as just suggested, there seems no reason to suppose that it is not possible for one seeking tenders to make a statement that he will accept the highest tender in such positive terms that the statement will amount to an offer and ripen into a contract with the person thereafter making the highest tender.

1 Williston, Contracts § 31 (3d ed. 1957). Appearance of the word "bid" in the parties' communications does not dictate their legal effect. The appropriate inquiry is whether Crawford's and Reilly's oral and written representations to Short that the highest bid would be accepted were couched in language so positive and contained material terms so definite that, in light of surrounding circumstances, the statements amounted to a binding offer.

In the present posture of this case, where the court is not trying issues of fact but only determining if issues of fact exist, *Corwine v. Crow Wing County*, 309 Minn. 345, 244 N.W.2d 482 (1976), it appears to us that whether the solicitation for Short's bid was an offer or only an invitation to make an offer is a question of fact that cannot be decided summarily. We still, however, must decide the validity of the form of Short's bid, since if it is void, the issue of whether an offer was made is moot.

### The Validity of a Sharp Bid

■ An early Illinois case, *Webster v. French*, 11 Ill. 254 (1849), designates a bid in the form "X dollars more than the highest bid" (X dollars less than the lowest bid would also qualify) as a "sharp practice" and holds it is contrary to public policy and void. Such a bid, said the *Webster* court, is inherently unfair to other bidders in a sealed bidding procedure, allowing the

---

5. In the same letter, Crawford stated that while ordinarily a price of $2,000,000 might be justified, here, because there were no hard assets, the time schedule was strict and the offer must be all cash, he felt the business would go for a price between $500,000 and $1,000,000, and it could be less.

sharp bidder to "appropriate" the judgment of the other bidders; it may also be unfair to the seller and, if allowed, would discourage and drive off specific–sum bidders.

Only a handful of cases have dealt with a sharp bid since, and they all adopt the rationale of *Webster*. The rule in Arkansas appears to be that a sharp bid is "no bid at all," being both unfair and incomplete. *Casey v. Independence County*, 109 Ark. 11, 15, 159 S.W. 24, 25 (1913). *See also Rogers v. Union National Bank of Little Rock*, 240 Ark. 261, 398 S.W.2d 904 (1966), and *Bank of Eastern Arkansas v. Bank of Forrest City*, 94 Ark. 311, 126 S.W. 837 (1910) (where, however, the contract was awarded to the sharp bidder, but only because the statute under which the public bidding was conducted permitted the county to reject all bids and to negotiate with the unsuccessful bidders without rebidding).

Two federal cases deal with sharp bids, *Holliday v. Higbee*, 172 F.2d 316 (10th Cir. 1949), and *Trump v. Mason*, 190 F.Supp. 887 (D.C. Cir. 1961). In *Holliday* the court stated the sharp bid is neither a bona fide bid nor a fair bid, adding "the Government was not required to give it consideration, especially under a bidding invitation in which the right was reserved to accept or reject any or all bids." 172 F.2d at 318. In *Trump* the court also condemns the sharp bid, both as destroying the integrity of the bidding system and as not a firm bid, but then, instead of saying the bid is void, holds only the government acted within its discretion in refusing to accept it. 190 F.Supp. at 889.

Sharp bidding can defraud both seller and sum–certain bidders in a sealed bidding procedure. The fraud on other bidders arises from the sharp bidder's concealment of the nature of his bid. The concealment induces the sum–certain bidders to submit bids which are necessarily ineffective and which guarantee the sharp bidder's supremacy. Were the nature of the bid revealed, other bidders could submit their own sharp bids and eliminate his advantage.[6] Also, a sharp

bid may work a fraud on the seller. It is argued in *Webster* that because a sharp bid gives the bidder a guaranteed high bid, he gets the property for less than he would have offered in a sum–certain bid. The seller is further injured if, as asserted in *Webster*, the prospect of a sharp bid frightens away potential sum–certain bidders, thus chilling competition.

For these reasons we hold concealed sharp bidding is a fraudulent practice. Having said this, there still remains the question of whether the fraud voids a contract made pursuant to the sharp bid or only makes the contract voidable.

■ The line between the void and the voidable is not easily defined; indeed, a spectrum of illegality is recognized with a concomitant range of attendant consequences. *See* 12 Williston, Contracts §§ 1486–88 (3d ed. 1970). Certain categories of agreements–for example, those relating to sexual favors, criminal activity or obstruction of justice—are always void. The nature of these and similar subjects leads courts to abstain from entertaining suits upon such agreements to shield their own integrity. At the other extremes are those contracts to which one party possesses a power of avoidance—for example, due to infancy, duress or fraud—which must affirmatively and seasonably be exercised to prevent enforcement. Agreements for which no case law precedents exist are adjudged either void or voidable depending upon, among other factors, the public or private nature of the contract and the origin and effect of the infirmity. According sharp bidding its proper place in this spectrum requires examining these factors.

■ If this were a public sale, a bid tainted with fraud, such as the sharp bid here, would be void from its inception. *Regan v. Babcock*, 188 Minn. 192, 247 N.W. 12 (1933). *Regan* involved collusive bidding for a state highway contract and the court, after observing that this differed from the ordinary fraud case where the rights of

---

6.  In *Webster v. French*, 11 Ill. 254 (1849), there were two sharp bids submitted and the court held it would be impossible to decide between them as to who was highest.

individuals are involved and where such contracts are commonly regarded as voidable, not void, went on to say, "but the law protects the public with greater safeguards and from public policy views contracts obtained as these are alleged to have been as wholly void." *Id.* at 200, 247 N.W.2d at 16. All the cited cases from other jurisdictions declaring sharp bids illegal *per se* involved sales that were either public, controlled by statute, or conducted under court supervision.

Since the sale at issue here is private in nature, no reason appears to declare Short's bid void on this basis.

The infirmity of a sharp bid, as said above, lies in the concealment of its nature. If there is no concealment, then bidders may be frustrated but they are not defrauded. Even when bidders are defrauded, any assertion of injury to the seller is speculative. By submitting a sharp bid, a bidder does not necessarily pick a price lower than he would otherwise offer in a sum-certain bid. Rather, he gambles that sum-certain bids submitted by others will be lower than the maximum he wants to pay. If they indeed are lower, the seller is injured by the sharp bid; if higher, then the seller's profits are increased by the bidder's choice to offer a sharp bid. As for an alleged chilling effect, sharp bidding may well impair competition, but if the practice is known to be allowed, the fraud by concealment is gone and the question is one of business practicability, not fraud. If unconcealed, sharp bidding either would then be abandoned as unworkable or sellers and bidders would adopt protective ground rules

to make it workable.[7] The practice is not necessarily destructive of sealed bidding generally.

For these reasons, concealed sharp bidding, while unfair, is not so fundamentally pernicious that it should be found void as contrary to public policy.[8] The nature of the fraud perpetrated by a sharp bidder appears little different in degree than other common law frauds. It violates no statute or clear public policy. *See Equitable Holding Co. v. Equitable Building & Loan Association*, 202 Minn. 529, 536, 279 N.W. 736, 741 (1938). We hold, therefore, that while concealed sharp bidding in a private context taints a resulting contract with fraud, the contract is not void but rather voidable at the timely election of the defrauded party. Restatement of Contracts § 476 (1932).

Ordinarily, the defrauded parties would be the seller and the highest sum-certain bidder. Thus in cases where a bidder sues the seller for accepting a bid submitted in response to a binding offer and demands specific performance, a contract resulting from receipt of a sharp bid would be voidable at the election of the seller or the highest conforming sum-certain bidder.

In this case, no other bidders but Andersen have challenged Short's bid. Andersen has yet to prove he received the same offer as Short and responded with a conforming bid.[9] Until he does, he cannot avoid Short's bid. If none of the bidders can avoid Short's bid, then neither, apparently, can the seller, Sun, since Sun was perfectly aware of the form of Short's bid. A trier of fact could find that Sun, by its officer and

---

7. The seller, for instance, might require any sharp bid to include a stated sum-certain, a floor or ceiling price, or a combination of these terms. While such rules may be of doubtful feasibility, it is not for this court to deny entrepreneurs an opportunity to use their own ingenuity. At least, "[t]his is not a field for the play of individual notions of public policy." *Perkins v. Hegg*, 212 Minn. 377, 379, 3 N.W.2d 671, 672 (1942).

8. *Webster* and the other cases cited also mention the sharp bid is not a firm bid, since it is not complete in itself but only in reference to other bids. It seems to us, however, that the

sharp bid must be considered in the context of the entire bidding procedure, and in that context it is intelligible.

9. Part of the problem here is that, depending on how the evidence is viewed, Sun, acting by Crawford and Reilly, may have made an offer to Short but only an invitation for an offer to Andersen. In other words, the bidding procedure may not have been the same for all bidders and Andersen and Short may each have contractual rights independent of the others. If so, this could be relevant to the defense of the claims for wrongful contractual interference.

agents, invited Short, even urged him, to submit his sharp bid, saying it would be acceptable, and, after the bids were opened, actually gave an opinion it was the high conforming bid. If such inducements to bid were made and Short relied on them, Sun would not then be in a position to disaffirm the solicited sharp bid. Restatement of Contracts § 484 (1932); *accord, Albachten v. Bradley,* 212 Minn. 359, 3 N.W.2d 783 (1942). Nor can it be said at this stage that the Star and Tribune has any independent power to avoid the sharp bid, as it may be bound by Sun's actions under their contractual arrangements.

■ Viewing the facts in the light most favorable to Short, it seems to us this raises questions of fact as to whether a contract resulted between Sun and Short and, if so, whether it could be and was avoided. Since the property has already been sold (Short, at Sun's request, did not oppose the sale to Andersen before closing), specific performance would not lie, but an action for breach of contract may. Plaintiff's claims for wrongful interference with a contract (dismissed by the trial court because it found no contract) remain also for trial.

At trial, the legal theories and issues may develop differently. Whether a party is likely to prevail at trial is not a consideration here. *Lowry Hill Properties, Inc. v. Ashbach Construction Co.,* 291 Minn. 429, 439, 194 N.W.2d 767, 774 (1972). We only say these issues cannot here be decided summarily as matters of law.

Reversed and remanded for proceedings consistent with this opinion.

OTIS, J., took no part in the consideration or decision of this case.