[No. D011627. Fourth Dist., Div. One. Dec. 13, 1991.]

LEROY L. CARVER III, Plaintiff and Appellant, v.
ROBERT A. TEITSWORTH et al., Defendants and Respondents.

COUNSEL

Thomas J. Anton, Elizabeth E. Mariani, Miller, Starr & Regalia and Harry D. Miller for Plaintiff and Appellant.

Jenkins & Perry, David R. Clark and Stephen V. McCue for Defendants and Respondents.

William M. Pfeiffer, Steven A. Sokol and Neil D. Kalin as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

## BENKE, J.—

### INTRODUCTION

In this case a prospective purchaser of real property submitted a sealed bid which stated he would pay "$1,000 more than any other sealed bid." Although such bids have been severely criticized, as we explain in greater detail below, the record here is not sufficient to determine whether the bid submitted in this case was fatally defective.

### FACTUAL AND PROCEDURAL BACKGROUND

#### A. *The Bidding*

The facts which give rise to the parties' dispute are for the most part, undisputed. In early September 1988, Robert A. Teitsworth decided to sell four acres of improved property he owns in Rancho Santa Fe. Toward that end he listed the property with a real estate broker. The listed price was $795,000.

One day after listing the property, Teitsworth's broker had two full-price offers. One offer was made by Leroy Carver III. The other offer was made by James E. Crowley and Marybeth Crowley. Faced with two interested buyers willing to pay his asking price, Teitsworth responded by delivering to Carver and the Crowleys identical documents entitled "COUNTER OFFER."

The "COUNTER OFFERS" were on forms published by amicus curiae, the California Association of Realtors (CAR). The words "COUNTER OFFER" appear at the top of the form in bold face type. After providing space to identify the buyer, the buyer's previous offer and the seller, the preprinted portion of the form states: "Seller accepts all of the terms and conditions in the above designated agreement with the following changes or amendments:" Following this statement, each form delivered to Carver and the Crowleys set forth a number of identical handwritten terms. The first and, for our purposes, most pertinent handwritten term was the following: "Sale price to be determined by sealed bid(s) at a price not less than $795,000, 2

PM. 9/12/88. Terms will not be renegotiated." According to Teitsworth's broker, he explained to Teitsworth that if one of the "COUNTER OFFERS" were accepted, Teitsworth would be obligated to convey the property. Teitsworth himself testified he understood the "COUNTER OFFERS" would create a "firm deal."

Shortly before 2 p.m. on September 12, 1988, Carver and the Crowleys appeared with their respective brokers at Teitsworth's broker's office. At approximately 2 p.m. Carver put a sealed envelope on the broker's desk. Teitsworth's broker then began to explain the bidding procedure. According to Carver, the Crowleys and their broker then asked to be excused, whereupon they went to an adjacent office where Carver saw James Crowley writing on a piece of paper. The Crowleys returned shortly thereafter.

Upon the Crowleys' return, Teitsworth's broker began opening bids. The first bid was on a folded piece of paper and was for $800,000; it was from another one of the broker's clients, John Cote. The Crowleys then gave the broker their bid, which was on a folded piece of paper and signed by James Crowley. The Crowleys' bid was for $851,501.

The last bid opened was the one presented by Carver. It was on a piece of paper signed by Carver and stated: "The sale price shall be the greater of seven hundred ninety six thousand dollars ($796,000) or one thousand dollars ($1,000.00) higher than any other sealed bid(s) received by seller or his agent at the bid opening." According to James Crowley, Carver's bid shocked Teitsworth's broker. The broker told Carver and the Crowleys, "I have no idea what to do. . . . As far as I am concerned the [Crowleys'] 851,501 is the highest bid."

Thereafter Carver and the Crowleys left the broker's office and consulted their respective counsel.

B. *Trial Court Proceedings*

As a result of consultation with counsel two actions were initiated. In San Diego County Superior Court case No. 604045, Carver sued Teitsworth, Teitsworth's broker and the Crowleys. He alleged he had a binding contract with Teitsworth for purchase of Teitsworth's property and he asked the court to order specific performance of the contract. He sought declaratory relief against the Crowleys. Carver also recorded a lis pendens against Teitsworth's property.

In San Diego County Superior Court case No. 605075, Teitsworth sued his broker, Carver and the Crowleys for declaratory relief. He sought judicial determination of which bidder was entitled to the property.

In both cases the Crowleys filed cross-complaints against Carver, Teitsworth and Teitsworth's broker. In their cross-complaints the Crowleys alleged their bid created a binding contract and that they were entitled to specific performance. As against Teitsworth they also alleged damages for breach of contract. The Crowleys alleged Carver and the broker were liable for interference with economic relations.

On March 6, 1989, the trial court consolidated both actions. Shortly thereafter Teitsworth and the Crowleys moved for summary adjudication of issues. The Crowleys also moved for specific performance of the contract they had alleged.

The trial court resolved the motions in the Crowleys' favor. The trial court found that Teitsworth's "COUNTER OFFER" was a binding offer to sell, not an invitation to bid. The trial court further found the Crowleys' bid was the highest bid submitted and that Carver's bid was "fatally uncertain." In addition to adjudicating those issues, the trial court ordered specific performance of the Crowleys' contract.

After the court's ruling on the motions, the Crowleys moved to expunge Carver's lis pendens. Their motion was granted. Carver then filed a petition for a writ of mandate in this court, seeking review of the expungement order. After granting a stay, we granted the writ and directed that the trial court reinstate the lis pendens until the time for appeal in the case had run or until we had issued a remittitur following Carver's appeal.

After we granted the writ, the trial court entered a formal order and judgment memorializing its earlier ruling on the summary adjudication issues and the order for specific performance. From that order Carver filed a notice of appeal, and Teitsworth filed a cross-appeal.

## ISSUES PRESENTED

On appeal Teitsworth contends the trial court erred in finding he had made a binding offer to sell to the highest bidder. On this issue the Crowleys and Carver agree: they contend Teitsworth's "COUNTER OFFERS" obligated him to convey to the highest bidder.

In his appeal Carver contends the trial court erred in finding his bid was defective. On this issue the Crowleys and Teitsworth agree: they believe the trial court's determination was proper.[1]

DISCUSSION[2]

I

 ██ ██ Because the rights of the Crowleys and Carver, if any, depend upon whether Teitsworth made a binding offer to sell his property, we take up Teitsworth's petition first.

██ As Teitsworth points out, in general, a seller who solicits sealed bids is not bound to accept the highest bid submitted. (See *Estate of Lynch* (1923) 62 Cal.App. 687, 689-690 [217 P. 807]; *Forgeron, Inc.* v. *Hansen* (1957) 149 Cal.App.2d 352, 361 [308 P.2d 406]; *Estate of Greer* (1968) 261 Cal.App.2d 827, 830 [68 Cal.Rptr. 344]; 3 Miller & Starr, Current Law of Cal. Real Estate (1989) § 8.2, pp. 270-272.) "[T]he mere advertising for bids does not in itself constitute an offer . . . and . . . the property advertised may be withdrawn at any time before acceptance." (*Estate of Lynch, supra,* 62 Cal.App. at p. 690; see also Rest.2d, Contracts, § 28, subd. (1)(a).)

However where the seller has manifested an intent to be bound by the highest bid submitted, his request for bids is an offer. As the commentators

---

[1]Amicus curiae, CAR, sides with Carver on both issues: it argues Teitsworth was bound to sell to the highest bidder and that Carver's bid was proper.

[2]In addition to the substantive issues presented by the parties, we must dispose of a procedural issue. The order and judgment from which Carver and Teitsworth appeal did not dispose of the Crowleys' interference with economic advantage claim against Carver or their claim for damages against Teistworth. Where, as here, all substantive issues between the parties have not been resolved, orders for specific performance are not themselves appealable. (See *Wesley N. Taylor Co.* v. *Russell* (1961) 194 Cal.App.2d 816, 820 [15 Cal.Rptr. 357]; *Olmstead* v. *West* (1960) 177 Cal.App.2d 652, 657 [2 Cal.Rptr. 443]; 7 Witkin, Cal. Procedure (3d ed. 1985) Judgment, §§ 10-12, pp. 458-461.) Thus, the trial court's order is not one final judgment and is not otherwise appealable. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal § 56, p. 78; *American Nat. Bank* v. *Stanfill* (1988) 205 Cal.App.3d 1089, 1095 [252 Cal.Rptr. 861].)

However, where a party has attempted to appeal from a partial judgment, we have discretion, in appropriate circumstances, to treat the appeal as an extraordinary writ. (*Olson* v. *Cory* (1983) 35 Cal.3d 390, 400-401 [197 Cal.Rptr. 843, 673 P.2d 720]; *U.S. Financial* v. *Sullivan* (1974) 37 Cal.App.3d 5, 12 [112 Cal.Rptr. 18].) Because none of the parties has objected to our power to determine the Crowleys' right to specific performance, because the parties have briefed the issue on the merits and because, in light of the lis pendens which is still in effect, a prompt resolution of the Crowleys' right to specific performance is necessary to avoid injustice, we will treat Carver's appeal and Teitsworth's cross-appeal as petitions for writs of mandate seeking orders directing the trial court to vacate its order for specific performance.

to the Restatement Second of Contracts explain: "A advertises, 'I offer my farm Blackacre for sale to the highest cash bidder and undertake to make conveyance to the person submitting the highest bid received at the address below within the next thirty days.' This is an offer, and each bid operates as an acceptance creating rights and duties conditional on no higher bid being received within thirty days." (Ch. 3, § 28, illus. to com. c, p. 81.)

■■ ■■ Here Teitsworth's "COUNTER OFFER" plainly manifests an intent to be bound.[3] In addition to the fact the form Teitsworth used is entitled "COUNTER OFFER," the form states that it "accepts" both buyers' previous "agreements," with the now familiar exception for price. The handwritten portion of the form then goes on to state "Terms will not be renegotiated."

Teitsworth's reliance on a preprinted portion of the form which states "The seller reserves the right to continue to offer the herein described property for sale" is not persuasive. Contrary to Teitsworth's argument, this caveat does not make the "COUNTER OFFER" an invitation to bid. Rather, as CAR, the publisher of the form, suggests, the caveat is merely an explicit reminder of the common law rule that an offer or counteroffer may be revoked at anytime prior to its acceptance. (See Civ. Code, § 1586; *Davies* v. *Langin* (1962) 203 Cal.App.2d 579 [21 Cal.Rptr. 682]; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts § 166; 54 Cal.Jur.3d § 32.)

We note CAR's interpretation makes the contract "operative, definite, reasonable, and capable of being carried into effect." (Civ. Code, § 1643.) We also note Civil Code section 1649, which provides that "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." Here Teitsworth and his broker both testified that consistent with CAR's interpretation, they wanted the "COUNTER OFFERS" to create a binding agreement between Teitsworth and the highest bidder.

In sum, there was no error in the trial court's determination the "COUNTER OFFER" was an offer to sell. Thus we must deny Teitsworth's petition and turn our attention to Carver's bid.

## II

■ In the trial court the parties discussed the propriety of Carver's bid largely in terms of whether a contract which embodied the pricing formula

---

[3]We note that because there is no conflict in the extrinsic evidence of the parties' intentions, we must independently interpret the "COUNTER OFFER." (See *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865-867 [44 Cal.Rptr. 767, 402 P.2d 839].)

set forth in his bid would be sufficiently certain to permit enforcement. In arguing such a formula—if accepted by the parties—would create a binding contract, Carver presents a persuasive case. (See *Cal. Lettuce Growers* v. *Union Sugar Co.* (1955) 45 Cal.2d 474, 482 [289 P.2d 785, 49 A.L.R.2d 496]; *Hennefer* v. *Butcher* (1986) 182 Cal.App.3d 492, 501 [227 Cal.Rptr. 318]; *Goodwest Rubber Corp.* v. *Munoz* (1985) 170 Cal.App.3d 919, 921 [216 Cal.Rptr. 604]; *Larwin-Southern California, Inc.* v. *JGB Investment Co.* (1979) 101 Cal.App.3d 626, 643 [162 Cal.Rptr. 52].) The law in California is clear that so long as the price may be objectively determined, a contract in which the price is not expressed may nonetheless be enforced. (*Cal. Lettuce Growers* v. *Union Sugar Co.*, *supra*, 45 Cal.2d at p. 482.) Here the price Carver is willing to pay is subject to objective determination—it is $1,000 over the Crowleys' bid of $851,501 or $852,501. Thus we do not believe Carver's claim can be defeated on the grounds any contract he may have formed with Teitsworth was not certain enough to enforce.

Although we have found no uncertainty which would prevent the formation of a contract between Carver and Teitsworth, we nonetheless have asked the parties to consider and brief the question of whether Carver's bid was defective under the holding in *Short* v. *Sun Newspapers, Inc.* (Minn. 1980) 300 N.W.2d 781 (*Short*). In *Short* the bidders were attempting to buy a newspaper and one bidder submitted a sealed bid which stated: "$25,000 more than the highest bid received, with a maximum of $500,000, and with a $5,000 good faith deposit." (*Id.* at p. 785.)

In criticizing the bid and setting forth the available precedent, the court in *Short* stated: "An early Illinois case, *Webster* v. *French*, 11 Ill. 254 (1849), designates a bid in the form 'X dollars more than the highest bid' (X dollars less than the lowest bid would also qualify) as a 'sharp practice' and holds it is contrary to public policy and void. Such a bid, said the *Webster* court, is inherently unfair to other bidders in a sealed bidding procedure, allowing the sharp bidder to 'appropriate' the judgment of the other bidders; it may also be unfair to the seller and, if allowed, would discourage and drive off specific-sum bidders.

"Only a handful of cases have dealt with a sharp bid since, and they all adopt the rationale of *Webster*. The rule in Arkansas appears to be that a sharp bid is 'no bid at all,' being both unfair and incomplete. [Citation.] See also *Rogers* v. *Union National Bank of Little Rock*, 240 Ark. 261, 398 S.W.2d 904 (1966), and *Bank of Eastern Arkansas* v. *Bank of Forrest City*, 94 Ark. 311, 126 S.W. 837 (1910) (where, however, the contract was awarded to the sharp bidder, but only because the statute under which the public bidding was conducted permitted the county to reject all bids and to negotiate with the unsuccessful bidders without rebidding).

"Two federal cases deal with sharp bids, *Holliday* v. *Higbee*, 172 F.2d 316 (10th Cir. 1949), and *Trump* v. *Mason*, 190 F.Supp. 887 (D.C. Cir. 1961). In *Holliday* the court stated the sharp bid is neither a bona fide bid nor a fair bid, adding 'the Government was not required to give it consideration, especially under a bidding invitation in which the right was reserved to accept or reject any or all bids.' 172 F.2d at 318. In *Trump* the court also condemns the sharp bid, both as destroying the integrity of the bidding system and as not a firm bid, but then, instead of saying the bid is void, holds only the government acted within its discretion in refusing to accept it. 190 F.Supp. at 889.

"Sharp bidding can defraud both seller and sum-certain bidders in a sealed bidding procedure. The fraud on other bidders arises from the sharp bidder's concealment of the nature of his bid. The concealment induces the sum-certain bidders to submit bids which are necessarily ineffective and which guarantee the sharp bidder's supremacy. Were the nature of the bid revealed, other bidders could submit their own sharp bids and eliminate his advantage. Also, a sharp bid may work a fraud on the seller. It is argued in *Webster* that because a sharp bid gives the bidder a guaranteed high bid, he gets the property for less than he would have offered in a sum-certain bid. The seller is further injured if, as asserted in *Webster*, the prospect of a sharp bid frightens away potential sum-certain bidders, thus chilling competition.

"For these reasons we hold concealed sharp bidding is a fraudulent practice." (*Short, supra*, 300 N.W.2d at pp. 787-788, fn. omitted.)

However, as the court in *Short* was careful to explain: "The infirmity of a sharp bid, as said above, lies in the concealment of its nature. If there is no concealment, then bidders may be frustrated but they are not defrauded. . . . *[I]f the practice is known to be allowed, the fraud by concealment is gone and the question is one of business practicability, not fraud.* If unconcealed, sharp bidding either would then be abandoned as unworkable or sellers and bidders would adopt protective ground rules to make it workable." (300 N.W.2d at p. 789, fn. omitted.)[4]

In general we agree with the Minnesota Supreme Court. A relative bid[5] may be valid, but only where a party expressly solicits relative bids or such bidding is objectively reasonable as being customary in a particular trade or industry.

---

[4]One of the practical problems posed by relative bids was illustrated in *Webster* v. *Fench* (1849) 11 Ill. 254 case, cited in *Short*. In *Webster* two relative bids were submitted and the court found it impossible to determine the highest bid.

[5]We note the *Short* opinion uses the term "sharp bid" to describe both undisclosed and fully disclosed relative bids. Because, like the Minnesota Supreme Court, we find nothing

Here it is clear that neither Teitsworth nor the Crowleys were aware that a relative bid would be submitted.[6] When Teitsworth's broker opened the bid and read it, even the broker did not know what to do. According to the Crowleys, Teitsworth's broker was shocked. The only inference we can draw from the record before us is that Teitsworth did not request or even contemplate the submission of relative bids. Whether Teitsworth or the Crowleys should have reasonably anticipated such a bid is a separate question which on this record remains unanswered. In our view the answer to that question may depend in large measure on expert evidence of custom and practice in the real estate industry. Given the limited issue raised below, none of the parties have had an opportunity to present such expert opinions or other evidence which might bear on what reasonable purchasers and sellers should expect when a sealed bid procedure is used to sell real property. Because Carver's bid was not too uncertain to form a contract, and because the record here is not sufficient to determine whether his bid was defective under *Short*, the trial court erred in entering summary judgment against him. Accordingly his petition must be granted.

Teitsworth's petition is denied; Carver's petition is granted. The parties are to bear their own costs.

Wiener, Acting P. J., and Work, J., concurred.

---

inherently offensive in use of relative bids where full disclosure has been made, we reserve use of the somewhat pejorative "sharp bid" for cases where there has not been full disclosure.

[6]According to Carver, on the morning of September 12, 1988, he called a broker he knew, William Cote (not related to John Cote, the third bidder), and discussed his plan to submit a relative bid. Apparently both Carver and Cote had some doubts about the bid because Cote agreed to consult an attorney he knew. Thereafter Carver met Cote in Newport Beach and the two drove to San Diego together. On the way to San Diego, Cote told Carver the attorney he consulted saw nothing wrong with the relative bid. Carver and Cote met Carver's San Diego broker at 1:15 p.m. At the broker's office, Cote wrote the sharp bid down on a piece of his own stationery and Carver signed it and put it in a sealed envelope.